889 A.2d 426

LARRY S. LOIGMAN, PLAINTIFF–RESPONDENT, v. THE TOWN-
SHIP COMMITTEE OF THE TOWNSHIP OF MIDDLETOWN IN
THE COUNTY OF MONMOUTH, NEW JERSEY AND THOMAS
J. SAVAGE, ESQ., DEFENDANTS–APPELLANTS, AND SAUN-
DER WEINSTEIN AND WILLIAM F. DOWD, ESQ., DEFEN-
DANTS.

Argued October 12, 2005—Decided January 18, 2006.

568

570

*Matthew J. Giacobbe,* argued the cause for appellants (*Scarinci & Hollenbeck,* attorneys; *Mr. Giacobbe* and *Steven W. Kleinman,* on the briefs).

*Linda B. Kenney,* argued the cause for respondent.

Justice ALBIN delivered the opinion of the Court.

In this appeal, we must determine whether the litigation privilege shields a lawyer from a civil suit charging him with the improper use of a sequestration motion to exclude a spectator from a public hearing. Plaintiff Larry Loigman, Esq. filed a federal civil rights lawsuit under 42 *U.S.C.A.* § 1983, alleging that

defendants Thomas J. Savage, Esq.[1] and the Township of Middle-town (Township) violated his First Amendment right to attend an administrative law hearing. The gist of the lawsuit is that Savage, the Township's specially retained labor attorney, persuaded the Administrative Law Judge to enter a sequestration order barring Loigman from the courtroom by pretending that Loigman was a potential witness in the case. In a jury trial on the § 1983 action, Loigman obtained a judgment against Savage and the Township. Both the trial court and Appellate Division rejected defendants' claim that Savage's request for a sequestration order was protected by the litigation privilege, thereby giving defendants absolute immunity from a § 1983 lawsuit. In addition, both courts determined that, under § 1983, Savage was acting as a "policymaker" in his capacity as the Township's lawyer in the case, thus making the Township vicariously liable for Savage's violation of Loigman's rights.

We now reverse. We hold that the litigation privilege protects Savage and the Township from being haled into a civil court to face a damages judgment as a result of Savage's sequestration motion. We also hold that Savage's role as special counsel for the Township at the administrative hearing did not transform him into a municipal "policymaker" under § 1983.

## I.

### A.

Our case begins with a civil service appeal filed by Robert Oches, a Middletown Township police officer who claimed that the Township wrongly denied him promotion to Chief of Police. Oches, who ranked number one on the Department of Personnel's promotion list, was promoted from Lieutenant to Deputy Chief of Police. He then filed an appeal with the Merit System Board, challenging the Township's promotion of a lower-scoring officer to

---

[1] Defendant Thomas Savage died before the filing of this appeal.

Police Chief. Oches asserted that the Township bypassed him for politically motivated reasons. The Merit Board transferred the matter to the Office of Administrative Law (OAL), where an Administrative Law Judge (ALJ) conducted hearings over twenty-three non-consecutive days.

On March 25, 1999, the first hearing day, the ALJ granted Oches' motion to sequester all witnesses in the case, with the exception of two Township witnesses who were assisting Savage in the presentation of the Township's case. Savage, the Township's special counsel, requested that Loigman, who was present, "be excused from the room as a potential witness." He contended that Loigman might be called during the Township's defense or rebuttal case. Loigman had not been listed as a witness or subpoenaed by either party. The ALJ reserved his decision and advised Savage to provide a summary of Loigman's expected testimony.

The following day, Savage renewed his sequestration motion and asked permission to amend the Township's Answers to Interrogatories to include Loigman as a potential witness. Savage maintained that Loigman, who had been a candidate for Township office, had information bearing on Oches' political retaliation claim. We need not discuss the merits of Savage's request for sequestration because Savage's alleged bad faith in seeking Loigman's removal from the courtroom is not important to the disposition of this appeal.[2]

Suffice it to say that based on Savage's representations, the ALJ ordered that Loigman be sequestered. Loigman, who was in attendance, denied that he was a witness and stated that he had never received a subpoena. He submitted that he "would never respond to a subpoena issued by Mr. Savage [who] would have to

---

[2] Loigman is a self-described watchdog and community activist in Middletown. The present case was not his first encounter with the Township as an adversary. In a previous matter in 1992, the Township served Loigman with a subpoena to testify, which he successfully quashed.

go to Superior Court to enforce it." Loigman remarked that he had no relevant information, that Savage's representations were "completely untrue," and that he had "no intention on testifying." Despite Loigman's argument, the ALJ ordered him to leave the hearing. The ALJ, however, voiced his belief that he was powerless to enforce his order. In defiance of the sequestration order, Loigman continued to attend the hearings.

Five months later, on October 1, 1999, the ALJ confirmed in a written order his earlier sequestration ruling and his belief that he lacked authority to enforce that ruling. He provided, however, that "if the subject matter of Loigman's potential testimony arose during Mr. Loigman's attendance, [he] would consider a request by [Savage] to suspend the hearing in order to permit an application to the Superior Court for enforcement of the order of sequestration." The ALJ noted in his written order that Loigman "has continued to attend the hearing as a spectator on a sporadic basis."

Notably, a day before the entry of that order, Loigman appeared in the public gallery of the hearing room. Savage asked the ALJ to direct Loigman to leave and, if Loigman did not comply, to adjourn the hearing to permit him to obtain a Superior Court order enforcing the sequestration ruling. In the face of that threat, which if carried out held the certainty of delaying the proceedings, Loigman chose to "voluntarily withdraw."

Several days later, in a letter to the Department of Personnel, Loigman requested that the Agency conduct an interlocutory review of the sequestration order. A week later, the Commissioner denied the request because Loigman was neither a party nor a party's attorney in the Oches matter. See N.J.A.C. 1:1–14.10(a). The Appellate Division rejected Loigman's motion for leave to appeal.

Unbowed by those rulings, Loigman continued to attend the hearings. For example, on the July 31, 2000 hearing date, Loigman refused to remove himself from the courtroom at the request of the ALJ. Despite all the sound and fury, Savage never sought

to enforce the sequestration order in the Superior Court and never called Loigman as a witness during the hearings.

B.

On January 31, 2000, Loigman filed a five-count verified complaint in lieu of prerogative writs in the Superior Court, Law Division, alleging various theories of liability against Savage, the Township, and others. The first four counts, which are not relevant to this appeal, were dismissed. The fifth count named only Savage and the Township as defendants and alleged that Savage deliberately made false statements to the ALJ with the improper design of having the ALJ exclude Loigman from the OAL hearings. In particular, the complaint alleged that Savage importuned the ALJ to exclude Loigman from public hearings and "on September 30, 1999, when Defendant Savage insisted that the proceedings be suspended, [Loigman] was forced and compelled to remove himself from the courtroom." The complaint concluded that Savage violated Loigman's "civil rights as guaranteed by the constitutions of the United States and of this State" and that Savage acted with the "purported authority as an officer of [the Middletown] Township Committee." Those allegations formed the basis of Loigman's § 1983 suit.

In moving for summary judgment, defendants argued that a lawyer's motion to sequester a witness, even if motivated by ill will and supported by misrepresentations, falls within the litigation privilege, and therefore Savage and the Township were immune from civil suit. Defendants explained that the judicial system would be "unworkable" if lawyers had to fear that what they said or did in court might subject them to civil litigation. Defendants did allow that a lawyer who made misrepresentations to a tribunal, such as an ALJ, would be subject to professional discipline. In denying the motion, the court determined that "intentionally lying" to a tribunal for the purpose of excluding a person from a public proceeding was a deprivation of a constitutional right, and was not privileged conduct.

After a three-day trial, a jury found in favor of Loigman, concluding that the "substantial motivating factor" behind Savage's sequestration motion was to deny Loigman his First Amendment right to attend a public proceeding and that Savage was acting as a policymaker for the Township. Nevertheless, the jury also found that Loigman suffered no damages and therefore gave him no monetary award.[3]

In moving for judgment notwithstanding the verdict, defendants claimed that the suit was barred by the litigation privilege and that Savage was not a policymaker, thus rendering the Township free from any liability. In denying that motion, the court held that the evidence supported a finding that "Savage was acting as a policy maker because he had unbridled authority and wasn't being monitored in his decisions as to who should be witnesses."

Based on the jury's verdict, the trial court granted Loigman's motion to "permanently enjoin[ ]" Savage and the Township from interfering with Loigman's right to attend future public hearings unless "otherwise provided by law and [Loigman] has been offered an opportunity, consistent with due process, to challenge any subpoena, order of sequestration, or similar order." Because the court determined Loigman to be the prevailing party pursuant to 42 *U.S.C.A.* § 1988(b), it awarded him attorney's fees.

### C.

In an unpublished per curiam opinion, the Appellate Division affirmed the trial court. The panel rejected the argument that the litigation privilege insulated defendants from a § 1983 civil suit. The panel found that, given Savage's misrepresentations and intentional misuse of the sequestration motion, "any form of immunity [was] unavailable to protect [his] improper conduct." With the litigation history between Loigman and the Township as background, the panel noted that Savage's "sequestration request

---

[3] Apparently, Loigman did not argue for a damages award before the jury.

appears to have been nothing more than an attempt to prevent Loigman from exercising his right to be an observer at a public hearing."

Next, the panel concluded that Savage was a policymaker, reasoning that "the Township passed a resolution appointing Savage as [its] counsel" and that "Savage apparently had exclusive authority to make all decisions in the matter," such as "what witnesses to call and what evidence to present." Finally, the panel upheld the trial judge's grant of injunctive relief and award of counsel fees and costs.

We granted the Township's petition for certification. 183 *N.J.* 213, 871 *A.*2d 91 (2005).

## II.

## A.

The central question is whether Savage and the Township may avail themselves of the litigation privilege in a § 1983 case. In answering that question, we first must examine both the text and history of 42 *U.S.C.A.* § 1983, and the relevant case law, to determine whether the litigation privilege is available in a civil rights case. If the litigation privilege may be raised as a defense in such a case, then we must decide whether Savage's conduct is entitled to the protection of the privilege.

Section 1983 provides that "[e]very person who, under color of" state law "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." In effect, the statute creates a remedy for the violation of rights found in the Constitution and elsewhere in federal law. *See Oklahoma City v. Tuttle,* 471 *U.S.* 808, 816–17, 105 *S.Ct.* 2427, 2432, 85 *L.Ed.*2d 791, 799–800 (1985). Section 1983 originated from the Civil Rights Act of 1871, which intended, at its core, to enforce the Fourteenth Amendment. *Monell v. Dep't of Soc.*

*Servs.,* 436 *U.S.* 658, 665, 98 *S.Ct.* 2018, 2023, 56 *L.Ed.*2d 611, 619–20 (1978); *Tenney v. Brandhove,* 341 *U.S.* 367, 369, 71 *S.Ct.* 783, 784, 95 *L.Ed.* 1019, 1023 (1951). In its modern context, § 1983 allows a person who has been denied his constitutional rights by an official acting under color of state law to seek redress both in state and federal courts. *See, e.g., Bennun v. Bd. of Governors of Rutgers,* 413 *F.Supp.* 1274, 1279 (D.N.J.1976) ("It is established that state courts exercise concurrent jurisdiction with the federal district courts over cases arising under 42 *U.S.C.* § 1983.").

Loigman alleges that Savage filed a spurious sequestration motion, causing him to be deprived of his First Amendment right to attend a public court hearing. *See, e.g., Richmond Newspapers v. Virginia,* 448 *U.S.* 555, 580 n. 17, 100 *S.Ct.* 2814, 2829 n. 17, 65 *L.Ed.*2d 973, 992 n. 17 (1980) (noting historical right of public access to both criminal and civil trials). In their defense, defendants claim that the litigation privilege provides them with the shelter of absolute immunity. The United States Supreme Court has never directly passed on whether the litigation privilege is a recognized immunity under § 1983. We therefore look to see how the Supreme Court has addressed similar immunities that have been raised in the § 1983 context.

Although the text of § 1983 does not enumerate specific immunities as a defense to a civil prosecution under the statute, the United States Supreme Court has "established that § 1983 is to be read in harmony with general principles of tort immunities and defenses rather than in derogation of them." *Imbler v. Pachtman,* 424 *U.S.* 409, 418, 96 *S.Ct.* 984, 989, 47 *L.Ed.*2d 128, 136 (1976). The Court has assumed that the legislators who passed the 1871 statute "were familiar with common-law principles, including defenses previously recognized in ordinary tort litigation, and that they likely intended these common-law principles to obtain, absent specific provisions to the contrary." *City of Newport v. Fact Concerts, Inc.,* 453 *U.S.* 247, 258, 101 *S.Ct.* 2748, 2755, 69 *L.Ed.*2d 616, 626 (1981). However, the Court has "not assume[d] that Congress intended to incorporate every common-law

immunity into § 1983 in unaltered form." *Malley v. Briggs,* 475 *U.S.* 335, 340, 106 *S.Ct.* 1092, 1095, 89 *L.Ed.*2d 271, 277 (1986). Thus, in determining the validity of the litigation privilege in the present case, the first step is to see whether that privilege was recognized in "tort actions at common law when the Civil Rights Act was enacted in 1871." *Id.* at 339–40, 106 *S.Ct.* at 1095, 89 *L.Ed.*2d at 277 (internal quotation marks omitted). The second step is to decide "whether § 1983's history or purposes nonetheless counsel against recognizing the same immunity in § 1983 actions." *Id.* at 340, 106 *S.Ct.* at 1095, 89 *L.Ed.*2d at 277 (internal quotation marks omitted).

### B.

█ The litigation privilege generally protects an attorney from civil liability arising from words he has uttered in the course of judicial proceedings. The privilege has deep roots in the common law, dating back to medieval England. *E.g., Cutler v. Dixon,* 76 *Eng. Rep.* 886, 887–88 (K.B.1585) (reasoning that allowing action for words spoken in "course of justice" would hinder litigation for "those who have just cause for complaint"); *Buckley v. Wood,* 76 *Eng. Rep.* 888, 889 (K.B.1591) (holding that "no action lies" for defamation even if words were false when spoken in "course of justice"); *Hodgson v. Scarlett,* 171 *Eng. Rep.* 362, 363 (C.P.1817) ("It is necessary to the due administration of justice; that counsel should be protected in the execution of their duty in Court; and that observations made in the due discharge of that duty should not be deemed actionable.").

The litigation privilege also found expression in the early common law of this country. For example, in *Hoar v. Wood,* a case involving a plaintiff who claimed to have been slandered during a court proceeding, the Supreme Court of Massachusetts declared that "[g]reat latitude of remark and observation is properly allowed to all persons, both parties and counsel, in the conduct and management of all proceedings in the course of the administration of justice." 44 *Mass.* (3 *Met.*) 193, 194 (1841). Relying on

common law authority, the Massachusetts high court held that "words spoken in the course of judicial proceedings, though they are such as impute crime to another, and therefore if spoken elsewhere, would import malice and be actionable in themselves, are not actionable, if they are applicable and pertinent to the subject of inquiry." *Id.* at 197. The benefit of the privilege extended to all expressions by counsel related to the litigation:

> [A] party or counsel shall not avail himself of his situation, to gratify private malice by uttering slanderous expressions, either against a party, witness or third person, which have no relation to the cause or subject matter of the inquiry. Subject to this restriction, it is, on the whole, for the public interest, and best calculated to subserve the purposes of justice, to allow counsel full freedom of speech, in conducting the causes, and advocating and sustaining the rights, of their constituents; and this freedom of discussion ought not to be impaired by numerous and refined distinctions.
>
> [*Id.* at 197–98.]

The litigation privilege has long been embedded in New Jersey's jurisprudence. *Fenning v. S.G. Holding Corp.*, 47 *N.J.Super.* 110, 117, 135 *A.*2d 346 (App.Div.1957) (observing that absolute immunity doctrine is firmly established principle and is "indispensable to the due administration of justice," and that lawyers and litigants must "be permitted to speak and write freely without the restraint of fear of an ensuing defamation action"). The public policy rationale for the litigation privilege has not changed in half a millennium.

 We are persuaded that the litigation privilege was firmly rooted in the common law as of 1871, the year of the passage of the Civil Rights Act, and therefore, we now must decide whether the privilege can be harmonized with the history and purposes of § 1983.

## C.

In § 1983 actions, the United States Supreme Court has accorded absolute immunity to judges, prosecutors, and witnesses testifying during judicial proceedings. In all three categories, such immunity was well-established in the common law. *Pierson v.*

*Ray,* 386 *U.S.* 547, 553–54, 87 *S.Ct.* 1213, 1217–18, 18 *L.Ed.*2d 288, 294 (1967) ("Few doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction, as this Court recognized when it adopted the doctrine . . . ." (citing *Bradley v. Fisher,* 80 *U.S.* (13 *Wall.*) 335, 20 *L.Ed.* 646 (1872))); *Imbler v. Pachtman,* 424 *U.S.* 409, 427, 96 *S.Ct.* 984, 993, 47 *L.Ed.*2d 128, 141–42 (1976) (concluding that prosecutors are entitled to same absolute immunity from § 1983 actions as they were afforded under common law); *Briscoe v. LaHue,* 460 *U.S.* 325, 334, 103 *S.Ct.* 1108, 1115, 75 *L.Ed.*2d 96, 107 (1983) ("[W]ith respect to private witnesses, it is clear that § 1983 did not abrogate the absolute immunity existing at common law . . . .").

The common policy thread that runs through judicial, prosecutorial, and witness immunity is the need to ensure that participants in the judicial process act without fear of the threat of ruinous civil litigation when performing their respective functions. For example, judicial immunity is "for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." *Pierson, supra,* 386 *U.S.* at 554, 87 *S.Ct.* at 1218, 18 *L. Ed.*2d at 294 (internal quotation marks omitted). The price paid for that public benefit is that even a "judge . . . accused of acting maliciously and corruptly" receives the protection of the immunity. *Ibid.* The purpose of the privilege is not to protect the few judges who may be corrupt, but to encourage fearless decision-making by the vast majority of judges who are honest. *See ibid.*

The same policy rationale exists for prosecutors and witnesses. Absolute immunity is conferred on prosecutors in § 1983 cases out of "concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Imbler, supra,* 424 *U.S.* at 422–23, 96 *S.Ct.* at 991, 47 *L.Ed.*2d at 139. Although prosecutorial immunity "leave[s]

the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty," it serves the "broader public interest" of ensuring that vexatious litigation not suppress "the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system." *Id.* at 427–28, 96 *S.Ct.* at 993–94, 47 *L.Ed.*2d at 142.

■ Likewise, immunity is conferred on witnesses in § 1983 cases for the purpose of advancing the truth-seeking function of the judicial process. A witness who has to consider the threat of a future civil action resulting from his testimony "might be reluctant to come forward to testify" or "his testimony might be distorted by the fear of subsequent liability." *Briscoe, supra,* 460 *U.S.* at 333, 103 *S.Ct.* at 1114, 75 *L. Ed.*2d at 106. In justifying witness immunity, the Supreme Court quoted Judge Learned Hand, who observed that " 'in a balance between the evils,' " it is " 'in the end better to leave unredressed the wrongs done ... than to subject those who try to do their duty to the constant dread of retaliation.' " *Id.* at 345, 103 *S.Ct.* at 1120–21, 75 *L.Ed.*2d at 114 (quoting *Gregoire v. Biddle,* 177 *F.*2d 579, 581 (2d Cir.1949), *cert. denied,* 339 *U.S.* 949, 70 *S.Ct.* 803, 94 *L.Ed.* 1363 (1950)).

## D.

■ The arguments arrayed in favor of judicial, prosecutorial, and witness immunity in § 1983 cases apply with equal force to the litigation privilege. Like judicial, prosecutorial, and witness immunity, the litigation privilege is essential for the proper functioning of our criminal and civil justice systems and is not at odds with the history and purposes of § 1983. At common law, the litigation privilege blanketed all participants in the court system; private attorneys were treated no differently than judges, government lawyers, and witnesses. *Briscoe, supra,* 460 *U.S.* at 334–35, 103 *S.Ct.* at 1115–16, 75 *L.Ed.*2d at 107–08. "[A]ll persons—governmental or *otherwise*—who were integral parts of the judicial process" were accorded absolute immunity from civil liability

because of the need " 'to assure that judges, *advocates*, and witnesses can perform their respective functions without harassment or intimidation.'" *Id.* at 335, 103 *S.Ct.* at 1115–16, 75 *L.Ed.*2d at 108 (quoting *Butz v. Economou*, 438 *U.S.* 478, 512, 98 *S.Ct.* 2894, 2913, 57 *L.Ed.*2d 895, 919 (1978)) (emphasis added). The public interest advanced by the litigation privilege is as compelling today as it was five hundred years ago.

Typically, the litigation privilege has been invoked by attorneys to safeguard them from defamation suits arising from comments made in the course of judicial proceedings. However, to address creative pleading, courts have extended the litigation privilege to cover unconventional and sometimes novel causes of action against attorneys acting within the judicial process. "As one scholar put it, as new tort theories have emerged, courts have not hesitated to expand the privilege to cover theories, actions, and circumstances never contemplated by those who formulated the rule in medieval England." T. Leigh Anenson, *Absolute Immunity from Civil Liability: Lessons for Litigation Lawyers*, 31 *Pepp. L.Rev.* 915, 928 (2004) (internal quotation marks omitted). In many jurisdictions, "[t]he spectrum of legal theories to which the privilege has been applied includes negligence, breach of confidentiality, abuse of process, intentional infliction of emotional distress, negligent infliction of emotional distress, invasion of privacy, civil conspiracy, interference with contractual or advantageous business relations, [and] fraud." *Id.* at 927–28 (footnotes omitted).

■ In New Jersey, the litigation privilege protects attorneys not only from defamation actions, but also from a host of other tort-related claims. *See, e.g., Rainier's Dairies v. Raritan Valley Farms, Inc.*, 19 *N.J.* 552, 564, 117 *A.*2d 889 (1955) ("If the policy, which in defamation actions affords an absolute privilege or immunity to statements made in judicial and *quasi*-judicial proceedings, is really to mean anything then we must not permit its circumvention by affording an almost equally unrestricted action under a different label."); *Middlesex Concrete Prods. & Excavating Corp. v. Carteret Indus. Ass'n*, 68 *N.J.Super.* 85, 91–92, 172 *A.*2d 22

(App.Div.1961) (explaining that same public policy concerns supporting application of litigation privilege in defamation action arise in action for tortious interference). Whether in a state tort action or a § 1983 case, the judicial process benefits whenever counsel is permitted "full freedom of speech, in conducting the causes, and advocating and sustaining the rights" of his clients. *See Hoar v. Wood, supra,* 44 *Mass.* (3 *Met.*) at 197–98. As we have previously recognized, the litigation privilege is "the backbone to an effective and smoothly operating judicial system." *Hawkins v. Harris,* 141 *N.J.* 207, 222, 661 *A.*2d 284 (1995) (internal quotation marks omitted).

We conclude that the litigation privilege applies to § 1983 claims. We can find nothing in the history and purposes of § 1983 that would lead us to conclude that the privilege should not apply in federal civil rights cases. Although our research has uncovered scant authority on this precise subject, we are not aware of any federal case disqualifying per se the litigation privilege in a § 1983 litigation. In *United States General, Inc. v. Schroeder,* the federal district court found that "as a general proposition, attorneys are held to be immune from civil liability under 42 *U.S.C.* § 1983" for conduct related to the judicial process. 400 *F.Supp.* 713, 717 (E.D.Wis.1975). The court explained that the immunity "is grounded upon critical social considerations, for, if an attorney must work in constant fear of civil liability, it is the rights of the public that will suffer." *Ibid.* Although accepting the broad contours of the litigation privilege, the court declined to give an attorney who willfully and maliciously commenced a frivolous and blatantly unconstitutional garnishment action the protection of the privilege. *Id.* at 717–18.[4]

---

[4] The court may have reached that conclusion because the litigation privilege is not available in a malicious prosecution action. *See, e.g., Thomason v. Norman E. Lehrer, P.C.,* 183 *F.R.D.* 161, 167 (D.N.J.1998) ("[T]he litigation privilege does not apply to tort claims for malicious prosecution."); *Silberg v. Anderson,* 50 *Cal.*3d 205, 266 *Cal.Rptr.* 638, 786 *P.*2d 365, 368 (1990) (explaining that litigation privilege is applicable in "all torts except malicious prosecution").

In *Walden v. Wishengrad*, the United States District Court not only recognized, but applied the litigation privilege in a § 1983 wrongful arrest case. 573 *F.Supp.* 1115, 1117 (W.D.N.Y.1983), *aff'd*, 745 *F.*2d 149 (2d Cir.1984). In that matter, the court conferred absolute immunity on a county social services department attorney for allegedly inducing a family court judge to issue a warrant for the plaintiff's arrest for failure to appear in court. *Id.* at 1116. The federal district court concluded that the social services attorney was "no less an integral part of the judicial process" than judges, prosecutors, and witnesses, to whom immunity has been extended in § 1983 cases. *Id.* at 1117 (internal quotation marks omitted).[5]

For the reasons discussed, we are confident that the United States Supreme Court would find that the litigation privilege is applicable in the prosecution of § 1983 civil rights cases.

### E.

 Next, we decide whether an attorney's sequestration motion falls within the protective sphere of the litigation privilege. The privilege shields "any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." *Hawkins, supra,* 141 *N.J.* at 216, 661 *A.*2d 284 (internal quotation marks omitted).

 Unquestionably, Savage's sequestration motion at an administrative hearing was a "communication" within a proceeding

---

[5] In *Kimes v. Stone,* the Ninth Circuit Court of Appeals refused to apply California's litigation privilege in a § 1983 action in which a private attorney was alleged to have conspired with a state court judge to deprive the plaintiff of property without due process of law. 84 *F.*3d 1121, 1124–26 (9th Cir.1996). Although the court ruled that "the common law did not provide immunity to private attorneys conspiring with a judge to deprive someone of their constitutional rights," *id.* at 1128, it did not address the general applicability of the litigation privilege in § 1983 cases.

covered by the privilege. *See, e.g., Erickson v. Marsh & McLennan Co.,* 117 *N.J.* 539, 563, 569 *A.*2d 793 (1990) ("A statement made in the course of judicial, administrative, or legislative proceedings is absolutely privileged and wholly immune from liability."); *Rainier's Dairies, supra,* 19 *N.J.* at 562–63, 117 *A.*2d 889 (holding that litigation privilege applied where action arose out of administrative hearing which "was actually conducted in manner and with safeguards similar to a judicial proceeding"). Moreover, as an attorney representing the Township, Savage was a "participant authorized by law" to make a sequestration motion. Sequestration of witnesses serves the salutary purpose of ensuring that a witness who is testifying not influence a witness who is about to testify. *See, e.g., State v. Harris,* 156 *N.J.* 122, 155, 716 *A.*2d 458 (1998) (explaining that purpose of sequestration motion is to prevent one witness from shaping testimony of other witness); *Morton Bldgs., Inc. v. Rezultz, Inc.,* 127 *N.J.* 227, 233, 603 *A.*2d 946 (1992) ("The purpose of sequestration is to discourage collusion and expose contrived testimony."). Seeking truthful, accurate, and non-tainted testimony certainly is the objective of every litigated case. Thus, Savage's motion was a "communication" entitled to the protection of the privilege.

In applying the privilege, we consider neither the justness of the lawyers' motives nor the sincerity of their communications. *See Hawkins, supra,* 141 *N.J.* at 213–15, 661 *A.*2d 284 (observing that "[t]he trouble with privileges is that they are granted to good and bad alike," and comparing litigation privilege with judicial immunity, which " 'is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences' " (quoting *Pierson, supra,* 386 *U.S.* at 554, 87 *S.Ct.* at 1218, 18 *L.Ed.*2d at 294)). We do not condone the intentional misuse of sequestration motions or any other trial device handled by attorneys. The litigation privilege does not immunize an attorney from disciplinary sanctions under the New Jersey Rules

of Professional Conduct. *See Hawkins, supra,* 141 *N.J.* at 215, 661 *A.*2d 284 (citing *Ruberton v. Gabage,* 280 *N.J.Super.* 125, 134, 654 *A.*2d 1002 (App.Div.), *certif. denied,* 142 *N.J.* 451, 663 *A.*2d 1358 (1995); *Kirschstein v. Haynes,* 788 *P.*2d 941, 950–51 (Okla. 1990)). An attorney who falsely represents to a court or tribunal his intent to call a person as a witness solely as a pretext for excluding that person from a courtroom violates the Rules of Professional Conduct and is subject to discipline. *See RPC* 3.3(a)(1) (providing that "[a] lawyer shall not knowingly . . . make a false statement of material fact or law to a tribunal"); *RPC* 8.4(c) (providing that "[i]t is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation"). This Court is committed to assuring that attorneys comply with accepted professional standards. *See, e.g., In re Harris,* 182 *N.J.* 594, 609, 868 *A.*2d 1011 (2005) (acknowledging Court's role in protecting public from unfit attorneys and requiring that attorneys "comply with the high standards that [legal] profession demands").

To ensure that the many honest and competent lawyers can perform their professional duties while furthering the administration of justice, the litigation privilege may protect the few unethical and negligent attorneys from a merited civil judgment and damages award. That trade-off is the necessary price that must be paid for the proper functioning of our judicial system, a system that requires attorneys to vigorously and fearlessly represent their clients' interests. We remain mindful that the extraordinary scope of the litigation privilege is mitigated to some degree by the comprehensive control that trial judges exercise over judicial proceedings, by the adversarial system, and by the sanctions faced by wayward attorneys through our disciplinary system. *See Butz, supra,* 438 *U.S.* at 512, 98 *S.Ct.* at 2914, 57 *L.Ed.*2d at 920; *Hawkins, supra,* 141 *N.J.* at 220–21, 661 *A.*2d 284.

Lawyers necessarily exercise a wide degree of discretion in performing their duties in the course of judicial proceedings,

and must be free to pursue the best course charted for their clients without the distraction of a vindictive lawsuit looming on the horizon. The litigation privilege must have sufficient breadth to advance the best interests of the administration of justice. For that reason, courts have extended the reach of the litigation privilege even to statements made by attorneys outside the courtroom, such as in attorney interviews and settlement negotiations. *Hawkins, supra,* 141 *N.J.* at 216, 661 *A.*2d 284.

For example, in *Peterson v. Ballard,* the Appellate Division applied the litigation privilege in dismissing a cause of action arising from an attorney's interview of a witness in anticipation of trial. 292 *N.J.Super.* 575, 579–80, 679 *A.*2d 657 (App.Div.), *certif. denied,* 147 *N.J.* 260, 686 *A.*2d 761 (1996). During the interview, the attorney allegedly used threats and intimidation to discourage the plaintiff from testifying for a coworker in a sexual harassment case against their employer and from filing her own harassment claim. *Id.* at 579–80, 679 *A.*2d 657. In affirming the dismissal of the plaintiff's claims, the Appellate Division held that "the litigation privilege attaches to [a lawyer's] pre-trial communications with witnesses even though they are alleged to have been conducted in a tortious manner." *Id.* at 589, 679 *A.*2d 657 (citing *Hawkins, supra,* 141 *N.J.* at 218, 661 *A.*2d 284).

Likewise, in *Ruberton, supra,* the Appellate Division dismissed a cause of action against an attorney that arose from threats he uttered during a settlement conference in a wrongful discharge suit. 280 *N.J.Super.* at 129, 132–35, 654 *A.*2d 1002. The attorney allegedly threatened to file a criminal action against the plaintiff-husband, thereby inducing him and his plaintiff-wife to accept a settlement on unfavorable terms. *Id.* at 129, 654 *A.*2d 1002. The panel relied on the litigation privilege in affirming the dismissal of the lawsuit, observing that "an attorney must be free to advance the strengths of his or her client's case in a candid and objective way, unfettered by the fear that the attorney may be the subject of a tort action, whether sounding in defamation or any other

'action under a different label.'" *Id.* at 133–34, 654 *A.*2d 1002 (quoting *Rainier's Dairies, supra,* 19 *N.J.* at 564, 117 *A.*2d 889).

Surely, if statements made *outside* of the courtroom related to the judicial process are protected by the litigation privilege, a motion to sequester a witness made *inside* the courtroom similarly must be protected. Without the protection of the privilege, an attorney might hesitate to exclude a potential witness from the courtroom out of fear of becoming ensnared in costly civil litigation. We cannot allow the frightful specter of retributive civil actions against attorneys to paralyze them from exercising mundane trial duties on behalf of their clients.

█ The Township, as a party, is entitled to the same protection under the litigation privilege as Savage, its representative. *See Briscoe, supra,* 460 *U.S.* at 335, 103 *S.Ct.* at 1115, 75 *L. Ed.*2d at 107–08 (" '[N]either party, witness, counsel, jury, or judge can be put to answer, civilly or criminally, for words spoken in office'" (alteration in original) (quoting *King v. Skinner,* 98 *Eng. Rep.* 529 (K.B.1772))); *Hawkins, supra,* 141 *N.J.* at 215, 661 *A.*2d 284 (recognizing absolute privilege of parties and their representatives for communications related to litigation). Thus, it is clear to us that the litigation privilege applies to a sequestration motion and that Savage and the Township were entitled to its protection.

By this decision, we do not in any way condone Savage's conduct, if in fact he used the sequestration motion as a pretext to remove Loigman from the hearing room, as the jury believed. Without begrudging Loigman's efforts to challenge the sequestration order by appealing to the Commissioner of the Department of Personnel and later to the Appellate Division, we note that he did have other possible forms of relief. He could have demanded that Savage enforce the sequestration order in Superior Court and there raised his First Amendment claim. Loigman also was free to file an ethics complaint against Savage.

We conclude that the litigation privilege applied to Savage's filing of a sequestration motion, thus clothing defendants with

absolute immunity from civil liability.[6]

## III.

■ Our determination that the litigation privilege confers absolute immunity on defendants resolves the § 1983 claim against them and, on that basis, we could end this opinion. Nevertheless, for the purpose of providing guidance, we briefly address Loigman's argument that, under § 1983, Savage acted as a "policymaker" as the Township's special counsel in the Oches matter. The Appellate Division concluded that Savage was a "policymaker" under § 1983. We disagree.

■ In a § 1983 action, a municipality is not liable for the conduct of one of its agents or employees through the doctrine of respondeat superior because vicarious liability is inconsistent with the causation requirements of § 1983. *Monell v. Dep't of Soc. Servs.*, 436 *U.S.* 658, 691–92, 98 *S.Ct.* 2018, 2036, 56 *L.Ed.*2d 611, 636 (1978). A municipality, however, is liable under § 1983 for the violation of a plaintiff's constitutional rights that resulted from a municipal "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* at 694, 98 *S.Ct.* at 2037–38, 56 *L.Ed.*2d at 638. The requirement that municipal liability rest on a wrongful "official policy ... was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 *U.S.* 469, 479, 106 *S.Ct.* 1292, 1298, 89 *L.Ed.*2d 452, 463 (1986).

A municipality may be liable for the acts or decisions of one of its "policymakers," provided the acts or decisions "may fairly be

---

[6] Today, Loigman, an attorney himself, may lament that the litigation privilege barred him relief in a civil court. But, tomorrow, he may welcome the protection that the privilege accords to him, his fellow attorneys, and all those who participate in the administration of justice.

said to represent official policy." *Id.* at 480, 106 *S.Ct.* at 1298, 89 *L.Ed.*2d at 463 (internal quotation marks omitted). In that respect, the realm of a municipality's liability is limited.

> Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.
>
> [*Id.* at 481–82, 106 *S.Ct.* at 1299–1300, 89 *L.Ed.*2d at 464–65 (citation and footnotes omitted).]

In *City of St. Louis v. Praprotnik*, the United States Supreme Court summarized the *Pembaur* analysis for determining when a municipality is liable for the acts of one of its policymakers. 485 *U.S.* 112, 123, 108 *S.Ct.* 915, 924, 99 *L.Ed.*2d 107, 118 (1988). First, the municipality faces § 1983 liability only for "acts which the municipality has officially sanctioned or ordered." *Ibid.* (internal quotation marks omitted). Second, the municipality is subject to liability only for the acts of those officials "who have final policymaking authority." *Ibid.* (internal quotation marks omitted). Third, state law determines "whether a particular official has final policymaking authority." *Ibid.* (internal quotation marks omitted). Last, the unconstitutional "action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in *that area* of the [municipality's] business." *Ibid.*

In light of those principles, it is clear to us that Savage was not a municipal "policymaker" for § 1983 purposes. Savage did not exercise control over a policymaking division of municipal government. *Cf. McMillian v. Monroe County*, 520 *U.S.* 781, 783, 793–95, 117 *S.Ct.* 1734, 1735–36, 1740–41, 138 *L.Ed.*2d 1, 6, 12–13 (1997) (deciding that "Sheriff of Monroe County" under Alabama law is state policymaker); *Webb v. Sloan*, 330 *F.*3d 1158, 1165 (9th Cir.2003) (concluding that "principal district attorneys 'are final policymakers for the local governments'" (quoting *McMillian, supra*, 520 *U.S.* at 785, 117 *S.Ct.* at 1737, 138 *L.Ed.*2d at 8)), *cert.*

*denied,* 540 *U.S.* 1189, 124 *S.Ct.* 1428, 158 *L.Ed.*2d 97 (2004); *Cherrits v. Vill. of Ridgewood,* 311 *N.J.Super.* 517, 534, 710 *A.*2d 586 (App.Div.1998) (recognizing that chief of police was policymaker for municipality). Savage served a limited role for the Township as its special counsel. Savage defended the municipality's appointment of a chief of police from a challenge by an officer who claimed that he was wrongly bypassed for that position. By hiring Savage to represent it in that litigation, the Township did not transform him into an official with "final policymaking authority."

■ Lawyers exercise considerable discretion in performing their duties on behalf of clients. In exercising his duties as a lawyer, Savage was responsible for making certain tactical and evidentiary decisions at the hearing, such as determining what evidence to present, which witnesses to call, how to cross-examine the various witnesses, and whether to request a sequestration order from the ALJ. In almost every case, trial lawyers will make the routine, and perhaps rote, decision whether to seek a sequestration order. Making a mundane sequestration motion is hardly the type of decision that reflects an officially sanctioned municipal policy. On the other hand, if the highest ranking Township officials conspired to pervert the judicial process by misusing a sequestration motion for the purpose of excluding a person from a courtroom who they had no intention of calling as a witness, that would be a different question. However, Loigman did not present any evidence of such a conspiracy or that Savage executed a *municipal policy* to deprive him of his constitutional right to attend judicial or quasi-judicial proceedings.

On that basis, the Township could not have been liable under § 1983.

## IV.

■ In view of the resolution of this case, we must reverse the Appellate Division and dissolve the injunction that "permanently enjoined" Savage and the Township from interfering with Loig-

man's right to attend a public hearing unless Loigman "has been offered an opportunity, consistent with due process, to challenge any subpoena, order of sequestration, or similar order." The jury made no finding that there was a municipal policy to exclude Loigman from public hearings or that Savage had done so on prior occasions. Moreover, Savage was not a municipal policymaker, and therefore, the Township did not bear vicarious responsibility for Savage's conduct under § 1983. Those circumstances compel the conclusion that an injunction was not an appropriate remedy.

An "[i]njunction is primarily a preventive remedy intended to afford relief against future acts or conduct which are against equity and good conscience ... rather than to remedy what is past and done or to punish for wrongs already committed." *Devine v. Devine,* 20 *N.J.Super.* 522, 527, 90 *A.*2d 126 (Ch.Div.1952) (citing *Soc'y for Establishing Useful Mfrs. v. Morris Canal & Banking Co.,* 1 *N.J. Eq.* 157, 191 (Ch.1830)); *accord Verna v. Links at Valleybrook Neighborhood Ass'n,* 371 *N.J.Super.* 77, 89, 852 *A.*2d 202 (App.Div.2004) ("A permanent injunction requires proof that the applicant's legal right to such relief has been established and that the injunction is necessary to prevent a continuing, irreparable injury."). Because Loigman never established that there was a Township policy to exclude him from public hearings, the injunctive relief served as a remedy for a past wrong rather than as a remedy to prevent future wrongs.

Last, we hardly need say that attorneys for the Township must abide by the Code of Professional Responsibility. We do not believe that an injunction needs to serve as a reminder. Making false representations to a tribunal and acting in bad faith to obtain a sequestration order will not be tolerated and will subject an attorney to discipline.

## V.

For the reasons expressed, we reverse the Appellate Division and remand to the trial court for the entry of a judgment dismissing the § 1983 complaint and the injunction against defen-

dants. In view of the resolution of this case, Loigman is not a prevailing party and therefore is not entitled to attorney's fees under 42 *U.S.C.A.* § 1988(b).

*For reversal and remandment*—Chief Justice PORITZ, Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—7.

*Opposed*—None.