966 A.2d 1091 (2009)
406 N.J. Super. 126
Phyllis RABINOWITZ and Andrew Rabinowitz, Plaintiffs-Appellants,
v.
Judith A. WAHRENBERGER, Esq., and Wahrenberger, Pietro & Sherman, LLP, Defendants-Respondents.
No. A-1626-07T1
Superior Court of New Jersey, Appellate Division.
Argued January 13, 2009.
Decided March 20, 2009.
*1093 Bruce H. Nagel, argued the cause for appellant (Nagel Rice, attorneys; Mr. Nagel, on the brief).
Elliott Abrutyn, Livingston, argued the cause for respondent (Morgan Melhuish Abrutyn, attorneys; Mr. Abrutyn, of counsel and on the brief; Thomas G. Rantas, on the brief).
Before Judges WEFING, PARKER and LeWINN.
The opinion of the court was delivered by
WEFING, P.J.A.D.
Plaintiffs appeal from trial court orders dismissing their complaint and assessing counsel fees and costs. After reviewing the record in light of the contentions advanced on appeal, we affirm the order dismissing the complaint but modify the assessment of costs and fees.
On July 13, 2006, Rebecca Rabinowitz, the daughter of plaintiffs Andrew and Phyllis Rabinowitz, was born prematurely at St. Barnabas Hospital in Livingston. Rebecca suffered from some respiratory distress at birth and remained hospitalized until July 18, 2006. On July 19, 2006, plaintiffs took Rebecca to the emergency room at St. Barnabas when she again appeared to be in respiratory distress. At the emergency room, Rebecca was seen by Lynn Reyman, M.D., who did not re-admit her to the hospital despite her parents' protests. They returned home with the baby who died two days later on July 21, 2006, after suffering a massive nose bleed.
In January 2007, plaintiffs, represented by Bruce Nagel, Esq., of Nagel Rice, commenced suit against Dr. Reyman. Dr. Reyman was represented in that suit by Judith Wahrenberger, Esq., of Wahrenberger, Pietro & Sherman. Plaintiffs alleged that Dr. Reyman was negligent when she did not admit the baby to the hospital on July 19, 2006, and that her negligence was a proximate cause of the infant's death.
On June 7, 2007, Ms. Wahrenberger deposed Andrew and Phyllis Rabinowitz on behalf of her client, Dr. Reyman. Ms. Rabinowitz was pregnant at the time of the deposition and under emotional stress. Ms. Rabinowitz was deposed first, and we are informed that she wept at several points while being deposed.
In his deposition, Mr. Rabinowitz noted that his wife had arranged to have a baby nurse after Rebecca was born. He said that when he and his wife arrived home after the baby's death, they were both distraught and unable to enter the house. He said that the police had driven the baby nurse to the train station. Ms. Wahrenberger asked which police department had come and the following exchange took place.
A. The Millburn Police. I believe it was the head of the Millburn Police because I had asked for him when Rebecca died because I had suspected there was a murder. So I asked for the head of police and the head of police, I was told, was coming.
Q. Why had you suspected a murder?
A. Negligent homicide is a murder.
Q. Why did you suspect negligent homicide?
A. Because the institution of Saint Barnabas failed to give my daughter proper *1094 treatment by releasing her when she was clearly still sick. And Dr. Reyman clearly saw a sick baby and clearly turned the other cheek and let her leave for her father to give her mouth to mouth. So both institutions and people just turned their head away from a clearly sick and dying child.
Q. And that was what you considered to be negligent homicide?
A. In my opinion, not as a lawyer, but as a parentI am a lawyer but not as a lawyer, as a parent, yes.
Q. Are you admitted to the Bar in any state?
A. New York and Washington D.C.
Q. Do you practice law?
A. Not as an outside counsel but for the firm, yes.
Q. Did you think that the baby nurse was in any way involved in negligent homicide?
A. Absolutely not.
Q. Was there ever a time that you thought she might have been
A. Absolutely not.
Q. Do you think the nanny may have ever been involved in negligent homicide?
A. Absolutely not.
Q. Did you think your wife may have been involved in negligent homicide?
A. Absolutely not.
Q. Do you think that your wife may have treated the baby roughly?
A. No.
MR. NAGEL: Enough
Q. Do you think that the baby nurse
MR. NAGEL: Enough
MS. WAHRENBERGER: We're talking about negligent homicide. I think I've got to ask these questions.
MR. NAGEL: No, you don't because it's not part of this case. It's his opinion.
THE WITNESS: I said my opinion as a parent, not as a lawyer. That's what I said.
MR. NAGEL: It's not part of this civil case. This is his opinion as a parent. It has no evidential value in a civil action so you don't have to go down this road.
MS. WAHRENBERGER: This baby had a subarachnoid bleed. One of the things that can cause a subarachnoid bleed is child abuse. This may very well be in this case. If you're not going to let him answer the questions
MR. NAGEL: Say that again.
MS. WAHRENBERGER: Listen to the record. If you're not going to let me ask these questions
MR. NAGEL: I'm going to tell you right now
MS. WAHRENBERGER: Excuse me. I'm speaking now.
MR. NAGEL: If you go down that route without an expert right now
MS. WAHRENBERGER: I would never go down that route without an expert.
MR. NAGEL: If you ask any of those questions to my clients who have lived through this tragedy, this deposition will end. So you've got a choice right now; you're going to take a different tact [sic]. If you ask one question that is even suggestive of the garbage that I just heard out of your mouth, this deposition will end.
MS. WAHRENBERGER: Mr. Nagel
MR. NAGEL: We'll go before the court and have a monitor appointed so you don't ask a question like *1095 that to insult these parents who have lived through this.
The deposition then continued without further incident.
The following month plaintiffs filed the instant two-count complaint against Ms. Wahrenberger and her firm. In the first count, they referred to the deposition sequence set forth above as "outrageous and inhumane" and "so reprehensible, despicable, nasty, venomous, malevolent and horrid as to violate the most basic foundation of humanity and decency." They sought damages on the theory of outrage. In the second count, plaintiffs sought damages for either intentional or negligent infliction of emotional distress. They alleged that defendant Wahrenberger had "intentionally elected to humiliate, embarrass, insult, and inflict the most grievous emotional distress" and that her "black-hearted attack" had been "calculated to cause severe emotional distress, humiliation, and offended all norms of civilized behavior and decency."
In lieu of filing an answer, defendants, through counsel, Elliott Abrutyn, Esq., of Morgan Melhuish Abrutyn, filed a motion to dismiss this complaint for failure to state a claim under Rule 4:6-2(e). Plaintiffs opposed this motion and cross-moved to disqualify the attorneys representing defendants. We are satisfied the trial court correctly denied the motion for disqualification and granted the motion to dismiss.

I
We turn first to the motion for disqualification. If that should have been granted, its denial would necessarily have tainted the remainder of the proceedings.
Nagel and his prior law firm had instituted several medical malpractice actions against Joseph Dello Russo, M.D., a physician who had an extensive practice in performing laser eye surgery. Dello Russo v. Nagel, 358 N.J.Super. 254, 261, 817 A.2d 426 (App.Div.2003). The law firm placed a newspaper advertisement seeking other clients who might have claims against Dello Russo. Id. at 262, 817 A.2d 426. Dello Russo responded by filing suit against Nagel and other attorneys in the firm, seeking injunctive relief and damages under several theories, including defamation and tortious interference. Id. at 260, 817 A.2d 426. Part of Dello Russo's claim rested upon the allegation that Nagel had, prior to publication of the advertisement, demanded $3 million to settle the pending suits and threatened to place such an advertisement if the money were not paid. Id. at 261, 817 A.2d 426. Elliott Abrutyn, Esq., successfully represented Nagel in that litigation, arguing in part that any statements that might have been made during a settlement conference were subject to the litigation privilege. Id. at 265-67, 817 A.2d 426.
Plaintiffs sought to disqualify Abrutyn from representing defendants in this matter because he had represented Nagel in the earlier matter. In support of their motion, plaintiffs relied upon R.P.C. 1.9. We agree with the trial court that R.P.C. 1.9 provides absolutely no basis upon which to disqualify Abrutyn in this matter. R.P.C. 1.9 sets forth the parameters that guide attorneys in handling matters adverse to the interests of former clients. The Rabinowitzes were never clients of Abrutyn. And, in pressing the motion, plaintiffs made no allegation that Abrutyn, as a result of representing Nagel in the earlier action, came into possession of any confidential information about Nagel or his prior firm.

II
The New Jersey Supreme Court has twice in recent years been called upon to *1096 consider the litigation privilege and upon each occasion it has strongly restated its views on the necessity and value of recognizing and enforcing the privilege. Loigman v. Twp. Comm. of Middletown, 185 N.J. 566, 889 A.2d 426 (2006) (holding that plaintiff's § 1983 action seeking damages for wrongful use of a sequestration order was barred by the litigation privilege); Hawkins v. Harris, 141 N.J. 207, 661 A.2d 284 (1995) (holding that investigators retained by defense counsel and insurers to investigate plaintiff in connection with a pending personal injury action were protected by the litigation privilege).
The Court noted the deep roots of the litigation privilege in the common law, and traced it back to medieval England. Loigman, supra, 185 N.J. at 579, 889 A.2d 426. It also recognized that the litigation privilege "has long been embedded in New Jersey's jurisprudence." Id. at 580, 889 A.2d 426. It described the litigation privilege as "indispensable" and said that "[t]he public policy rationale for the litigation privilege has not changed in half a millennium." Ibid.
There are four elements to the privilege. It is applicable to
any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.
[Hawkins, supra, 141 N.J. at 216, 661 A.2d 284 (citation omitted).]
The only limitation which New Jersey places upon the privilege is that the statements at issue "have some relation to the nature of the proceedings." Id. at 215, 889 A.2d 426 (quoting Devlin v. Greiner, 147 N.J.Super. 446, 453, 371 A.2d 380 (Law Div.1977)).
Of particular import to the present matter, the litigation privilege is not restricted to statements made during the course of judicial proceedings; it "has been expanded beyond strictly judicial proceedings to encompass so-called `quasi-judicial' proceedings as well." Zagami, LLC v. Cottrell, 403 N.J.Super. 98, 105, 957 A.2d 691 (App.Div.2008) (holding that statements made in connection with an application to renew a liquor license are covered by the litigation privilege). It has been held applicable to statements made during settlement discussions, Dello Russo, supra, 358 N.J.Super. at 267, 817 A.2d 426, and to statements made during the course of pretrial investigation. Hawkins, supra, 141 N.J. at 217, 661 A.2d 284.
Pretrial investigation is "necessary to a thorough and searching investigation of the truth," and, therefore, essential to the achievement of the objects of litigation.... "The evaluation and investigation of facts and opinions for the purpose of determining what, if anything, is to be raised or used in pending litigation is as integral a part of the search for truth and therefore of the judicial process as is the presentation of such facts and opinions during the course of the trial, either in filed documents or in the courtroom itself." Pretrial communications by parties and witnesses are protected "to promote the development and free exchange of information and to foster judicial and extra-judicial resolution of disputes."
[Id. at 217-18, 661 A.2d 284 (citations omitted).]
Depositions are an integral part of pretrial proceedings. R. 4:14; R. 4:15; R. 4:16. Counsel must be free at a deposition to explore and probe the claims that have been asserted against his or her client. To expose the attorney to the risk of litigation on the basis of such questioning would *1097 subvert the underlying policy of the litigation privilege and would be antithetical to the views repeatedly expressed by our Supreme Court.
Here, plaintiff Andrew Rabinowitz stated at his deposition that he suspected criminal wrongdoing in connection with the death of his child. The loss of a child is immeasurable. That Mr. Rabinowitz may have been distraught and enraged at his loss does not mean that he is entitled to have his statements go unquestioned. In our view, defendant Wahrenberger would have been derelict in her duties to her own client if she had not questioned him about his statement that his child's death was due to what he termed negligent homicide.
The trial court was entirely correct in concluding that plaintiffs' complaint should be dismissed.
After the trial court dismissed plaintiffs' complaint, defendants moved for an award of counsel fees and sanctions under Rule 1:4-8. Abrutyn submitted a certification of his services in defending this matter and the costs his firm had incurred. Plaintiffs opposed the motion. Nagel asserted the complaint had been brought in good faith and noted that another judge, in connection with the underlying malpractice action, had criticized defense counsel for asking these questions.[1]
The trial court granted the motion for counsel fees and costs. It noted that defendants had complied with all of the procedural requirements of Rule 1:4-8. It reviewed in detail its earlier analysis of the lack of merit to the complaint. It observed that Nagel should have been particularly familiar with the litigation privilege since that was one of the bases upon which he prevailed when Dello Russo had sued him. The trial court proceeded to analyze in meticulous detail the certification of services which had been submitted by Abrutyn, detailing which services it deemed compensable and which not.[2] Based upon that review, the trial court entered an order that Nagel and his clients, the Rabinowitzes, were responsible for counsel fees and costs of $11,630. The trial court also noted in its oral opinion certain reported opinions which had commented upon Nagel's aggressiveness in pursuing litigation, and imposed a sanction of $2500.
In reviewing this record, we do not find any indication that the Rabinowitzes were the motivating force behind this litigation. The conclusion, to us, is inescapable, that it was Nagel's idea to start this litigation and to pursue it. An attorney's pursuit of a frivolous suit should not be imputed to the client. Savona v. Di Giorgio, 360 N.J.Super. 55, 63, 821 A.2d 518 (App.Div.2003). If there is evidence of a client's determination to pursue a frivolous suit, the client may be liable under N.J.S.A. 2A:15-59.1. There is nothing in this record which would support a finding that the Rabinowitzes were bent on continuing this suit and we therefore conclude that the award of counsel fees and costs should run only against Nagel.
Finally, we have concluded that the award of sanctions should be vacated. We reach this conclusion for two reasons. In the course of its oral opinion, the trial court stressed prior instances of aggressive litigation tactics on the part of Nagel. It did not point to anything in particular with respect to this action other than the fact that it had been commenced. *1098 Sanctions should relate to present conduct, not past conduct. In our judgment, modifying the trial court order to the extent that Nagel is liable for the entire award of counsel fees and costs is a sufficient sanction.
We thus affirm the trial court order dismissing plaintiffs' complaint and remand this matter to the trial court for entry of an amended order in accordance with this opinion.
Affirmed as modified.
NOTES
[1] We do not have the record or the context in which such remarks were allegedly made and thus have no occasion to pass upon them.
[2] We note that no issue is raised on appeal as to the quantum of the award; the argument is restricted to the contention that no award is warranted.