**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0273-21

ROSA M. WILLIAMS-HOPKINS
AND RANDY HOPKINS,
on behalf of themselves and those
similarly situated,

      Plaintiffs-Appellants,

v.

MEDWELL, LLC,

      Defendant-Respondent.

_____

> Argued November 8, 2023 – Decided April 5, 2024
>
> Before Judges Haas, Gooden Brown and Natali.
>
> On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Docket No. DC-007833-19, and Law Division, Bergen County, Docket No. L-7294-19.
>
> Philip D. Stern argued the cause for appellants (Kim Law Firm LLC, attorneys; Philip D. Stern and Yongmoon Kim, on the briefs).

Vafa Sarmasti argued the cause for respondent (Sarmasti PLLC, attorneys; Vafa Sarmasti, on the brief).

PER CURIAM

This appeal arises from a dispute between appellants[1] Rosa M. Williams-Hopkins and Randy Hopkins and respondent MedWell, LLC (MedWell), regarding fees for healthcare services MedWell provided to appellants in July and August 2018. MedWell filed a collection action against appellants in the Passaic County Special Civil Part (the Passaic County action) to recoup outstanding fees, and in doing so, attached documents which contained appellants' personal medical information.

Rather than filing a counterclaim in the Passaic County action, appellants responded by filing a seven-count putative class action complaint in the Bergen County Law Division (the Bergen County action) on behalf of themselves and other MedWell patients allegedly aggrieved by its billing, collection, and disclosure practices. Specifically, appellants alleged MedWell's billing and collection practices violated the Consumer Fraud Act (CFA), N.J.S.A. 58-1 to -20, for which they sought a declaratory judgment, injunctive relief, and

_____

[1] We refer to the plaintiffs as appellants because they were also defendants in an action which was consolidated into the instant matter, as we further detail infra.

2                                                                                    A-0273-21

compensatory damages (counts one and two); unjustly enriched MedWell (count three); and violated the Racketeer Influenced Corrupt Organizations Act (RICO), N.J.S.A. 2C:41-1(e)(2) (count four). Additionally, appellants claimed MedWell's practice of improperly disclosing personal medical information in its collection lawsuits was negligent (count five), breached its contracts with the putative class members (count six), and invaded their privacy (count seven). Appellants alerted the court of the pending Passaic County action and moved to consolidate the two cases, which the court granted.

Appellants challenge four orders: (1) a February 28, 2020 order granting MedWell's summary judgment motion and awarding it $5,250 in the Passaic County action; (2) an August 31, 2020 order granting MedWell's motion to dismiss counts one through four of the Bergen County action; (3) a July 1, 2021 order denying class certification in the Bergen County action; and (4) an August 12, 2021 order granting MedWell's summary judgment motion and dismissing counts five through seven of the Bergen County action. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

Specifically, we reverse the February 28, 2020 order in the Passaic County action as we are satisfied material factual issues with respect to the reasonableness of the amount claimed precluded summary judgment. Next, we

3

reverse the August 31, 2020 order to the extent it dismissed counts one and two of the Bergen County action because we conclude these claims were not barred by collateral estoppel, the entire controversy doctrine, or the learned professional exception to the CFA.

We affirm the July 1, 2021 order as we discern no abuse of discretion in the court's determination that appellants had not established numerosity or typicality of the class because unlike appellants' claims, those of the putative class members would be barred by res judicata and the entire controversy doctrine. Finally, we affirm the August 12, 2021 order as to counts five and six of the Bergen County action because appellants failed to demonstrate a material factual issue as to damages, but we reverse as to count seven because (1) appellants had a reasonable expectation of privacy in the information disclosed, (2) the information disclosed was not subject to the litigation privilege, and (3) appellants were not required to establish monetary damages to prevail.

I.

A. The Agreements Between the Parties

We begin by reviewing the pertinent facts in the record. MedWell provides medical, physical therapy, and chiropractic services. In July and August 2018, appellants were married and covered under the same insurance

4

policy. Both appellants sought treatment from MedWell during those months, although the nature of that treatment is unclear from the record. In connection with MedWell's services, appellants separately signed identical agreements entitled "Confidentiality and Payment for Services" (the C&P agreements). Due to the poor quality of the copy of the C&P agreements in the record, the date each was signed is illegible. In relevant part, the C&P agreements provide:

> <u>I am primarily responsible for</u>, and agree to make payment of my [1] co-pay, [2] co-insurance, [3] applicable deductible amounts, and [4] <u>all other amounts to which my insurance company has not paid any sums or as to any services by MedWell with respect to which my insurance company has denied coverage</u>.
>
> [Emphasis added.]

The C&P agreements also required appellants to remit any checks they received from their insurance provider within five days and held them responsible for "all attorneys' fees and costs incurred by . . . MedWell for collection of such amount(s) from [appellants]."

With respect to disclosure of medical information, the C&P agreements state:

> Confidentiality: MedWell, its employees, and staff are permitted to release my personal, health, or treatment information or files <u>to my insurance company</u> prior to, and <u>only for the purposes of processing and receipt of payment due from my insurance company</u> for services

5

provided by MedWell. I strictly prohibit any subsequent release or disclosure of such information to my insurance company without my express written authorization . . . .

Use of Patient's Likeness: I hereby authorize MedWell, their respective successors and assigns and anyone authorized by MedWell to copyright and/or use my name, statements, picture, video, or other likeness, in whole or in part, relating to the services and care I receive and to modify, edit and combine the same in any and all present and future media for purposes of advertising, publicity, and trade, including the right to attribute to me any statement deemed to be an endorsement and in connection with this use.

[Emphasis added.]

Appellants also separately signed identical intake agreements on July 7, 2018, which provide, in part:

I understand that my insurance policy with my insurance company is an arrangement between me and my insurance company. I acknowledge that I am the primary person responsible for payment of services provided by MedWell. I agree to pay the co-pay, co-insurance and applicable deductible amounts to MedWell immediately as and when each is billed or demanded by MedWell. . . . I agree to forward MedWell all checks and explanation of benefits that I receive from any of my insurance companies related to services I receive at MedWell within five (5) days of receiving them, and further agree that if I fail to forward any such payment, I will be responsible for payment of the amount I receive from my insurance companies for such services, plus interest of 12% per year calculated on a daily basis at a rate of .0329%, payable beginning

6

five (5) days from the date that I receive such payment from my insurance companies, plus all attorneys' fees and costs incurred by MedWell for collection of such amount(s) from me. . . . I further understand that certain services and care may not be covered by my insurance policy and therefore agree to pay for those services within 30 days of being billed by MedWell. I further agree to pay for the services I receive at MedWell within 30 days of being billed for such services in the event my insurance company denies coverage for any reason.

[Emphasis added.]

The intake agreements add "I understand and agree that I [am] responsible to pay for all services not covered by my insurance or healthcare plan and for all balances that is/are unpaid by insurance carrier or healthcare plan for services and equipment provided by MedWell."  (Emphasis added).

As to disclosure of medical information, the intake agreements state:

MedWell, its employees, and staff are permitted to release my personal, protected health information and treatment related information or files to my insurance company or third-party payor prior to, during, or subsequent to MedWell's services and treatments for purposes of obtaining authorizations, processing of claims and appeals, and receipt of payment due from my insurance company or third-party payor for services provided by MedWell.  . . .

I hereby authorize MedWell, their respective successors and assigns and anyone authorized by MedWell to copyright and/or use my name, information, including but not limited to healthcare

7

> information, statements, picture, video, or other likeness, in whole or in part, relating to the services and care I receive and to modify, edit, and combine same in any and all present and future media <u>for purposes of advertising, publicity and trade</u> including the right to attribute to me any statement related to MedWell's services and in connection with this use.
>
> [Emphasis added.]

MedWell billed appellants and their health insurance a total of $8,900 for services provided in July and August 2018. In response, appellants' insurer sent checks totaling $4,744 directly to appellants, of which they paid MedWell $3,650.

B. The Passaic County Action and MedWell's Disclosure of Appellants' Personal Medical Information

In July 2019, MedWell filed the Passaic County action, alleging appellants owed it $5,250 for outstanding medical fees and $1,750 for attorneys' fees. It appended to its complaint appellant Williams-Hopkins' signed intake agreement, which included, in addition to appellants' shared insurance policy number, unredacted personal medical information provided by appellant Williams-Hopkins such as her current medications, surgical history, family medical conditions, and allergies. In their answer, appellants advised they intended to file a class action complaint against MedWell and to seek consolidation. Appellants also moved pursuant to <u>Rule</u> 1:38-7(g) to have the intake agreement

A-0273-21

removed and replaced with a redacted version, which the court granted in October 2019. The unredacted intake agreement containing appellants' personal medical information remained publicly available for approximately four months.

MedWell also filed unredacted copies of documents containing appellants' personal medical information on three additional occasions: (1) two separate filings in support of its motion for a protective order in October 2019, (2) as part of its opposition to appellants' motion in limine in January 2020, and (3) in support of its motion to dismiss in June 2020. Appellants again moved to have each of these documents removed and replaced with a redacted version. The court granted appellants' request as to the October 2019 filing in December 2019, and as to the June 2020 filing in February 2021, but did not rule on the request with respect to the January 2020 filing. Cumulatively, these filings containing appellants' personal medical information were available in the public court record for at least ten months. It is unclear from the record whether the January 2020 filing has ever been replaced with a redacted version.

C. The Bergen County Action

In October 2019, appellants filed the Bergen County action and moved to consolidate the Passaic County action with it. In the complaint, appellants defined two classes: an "overcharge" class, consisting of New Jersey individuals

from whom MedWell "sought to collect amounts for amounts not actually owed or for which Med[W]ell included interest at more than twice the lawful interest rate," and a "disclosure" class, consisting of New Jersey individuals whose "private medical information" was disclosed "to the public" by MedWell. Within the overcharge class, appellants further identified a subclass of those "who incurred expenses as a result of Med[W]ell's collection efforts, paid any money or from whom [MedWell] collected any money on the account."

Counts one through four related to the overcharge class. In count one, appellants alleged MedWell's billing and collection practices were "unconscionable commercial practices" in violation of the CFA. They sought a declaratory judgment that the underlying collection accounts and interest charges were unlawful, and an injunction barring MedWell from "any attempt to collect upon, enforce or assign the accounts, or to seek collection remedies on or assign any outstanding judgments entered in collection actions on the accounts." In count two, appellants asserted MedWell's "unconscionable commercial practices" had caused the overcharge class "ascertainable loss" for which they were entitled to damages under the CFA. Count three claimed MedWell was unjustly enriched by receipt of funds from the overcharge subclass based on "illegally obtained accounts and judgments" and sought restitution of

10

those funds, while count four alleged MedWell's interest charges were usurious and its attempts to collect an "unlawful debt" violated RICO.

Counts five through seven pertained to the disclosure class. In count five, appellants maintained MedWell owed the class "a duty to maintain the confidentiality of their medical records," which it breached by negligently disclosing personal medical information in collection actions. Count six asserted MedWell's disclosure of personal medical information breached the "HIPPA[2] [sic] Privacy Policy" maintained on its website at http://www.fixlowback.com, upon which the class "materially relied." Finally, in count seven, appellants alleged MedWell invaded the class's privacy by publicly disclosing their private medical information in its collection actions. For each of these claims, appellants stated the disclosure class had "suffered a compensable loss" and sought damages.

D. Summary Judgment in the Passaic County Action and Consolidation

While the consolidation motion was pending, MedWell moved for summary judgment in the Passaic County action and, in support, provided the certification of its account manager, appellants' responses to interrogatories, the

---

[2] We presume this is intended to refer to the federal Health Insurance Portability and Accountability Act (HIPAA), 42 U.S.C. §§ 1320d to 1320d-9.

intake and C&P agreements, and the Explanations of Benefits (EOBs) it received from appellants' insurer. Appellants cross-moved for partial summary judgment, seeking to limit the amount owed to $1,094 and deny MedWell's request for attorneys' fees. Appellants' supporting documents included their certifications, two handwritten notes reflecting cash and money order payments they allegedly made to MedWell, the complaint and motion to consolidate filed in the Bergen County action, and MedWell's responses to interrogatories.

On February 28, 2020, the Bergen County Law Division granted appellants' consolidation motion and ordered the Passaic County action transferred and consolidated into the Bergen County action. That same morning, the parties appeared for oral argument on their summary judgment motions in the Passaic County action. In response to appellants' contention that the motions could no longer be heard by the Passaic court, the judge contacted the Bergen County assignment judge for clarification, who advised the Passaic court "ha[d] the obligation to deal with any motions that [we]re outstanding [t]here before [the matter] gets transferred." Accordingly, the matter proceeded to oral argument.

MedWell argued appellants' interrogatory responses confirmed they had paid only $3,650 of the $4,744 received from their insurer, despite their

12

obligation under the agreements to pay for the entire amount billed regardless of any insurance coverage. It noted there was "no dispute that the services were provided . . . [regarding] the amount of charges that MedWell has billed . . . [or] as to the quality of services."

Appellants contended the language of the C&P agreement must be read to mean that they are responsible for "all other amounts to which [their] insurance company has not paid any sums" only when the insurer has "denied coverage" entirely. As it was undisputed the insurance company had not denied coverage, they argued they were not responsible for any amount beyond the $4,744 approved by their insurance, of which only $1,094 remained outstanding.

Next, appellants asserted MedWell bore the burden of proving the amounts billed were reasonable because the agreements contained nothing about pricing. They also raised several arguments they do not reprise before us, including that the improper disclosure of their medical information negated their obligation to pay, they were not jointly liable for the debt, and there existed a factual dispute as to the amount they paid MedWell, demonstrated by their

certifications and handwritten notes which stated they had paid an additional $1,094 not reflected in MedWell's records.[3]

As to attorney's fees, MedWell asserted it was entitled to fees based on the language in the agreements. Appellants responded the agreements provided only for attorneys' fees actually incurred, and since MedWell's interrogatory responses revealed its counsel was paid one-third of the amount collected on contingency but MedWell had not yet obtained any funds, no fees had been incurred.

In an oral ruling and accompanying February 28, 2020 order, the court granted MedWell summary judgment and denied appellants' cross-motion. First, it found the record established appellants had paid MedWell only $3,650, discrediting appellants' claims in their certifications that they had made additional payments as contrary to their interrogatory responses under the sham affidavit doctrine. The court next rejected appellants' interpretation of the C&P agreements, concluding the phrase "all other sums to which [appellants'] insurance company has not paid any sums" meant "an outstanding balance on

_____

[3] We consider each of these arguments abandoned. See Green Knight Capital, LLC v. Calderon, 469 N.J. Super. 390, 396 (App. Div. 2021) (holding "[a]n issue not briefed on appeal is deemed waived" (quoting Woodlands Cmty. Ass'n. v. Mitchell, 450 N.J. Super. 310, 319 (App. Div. 2017))).

the services after insurance payment . . . as opposed to denying coverage, which is listed as completely separate from this circumstance." Finally, it found appellants had not presented "substantial evidence with respect to any of [their] remaining defenses which would warrant denial of summary judgment," noting "[i]f the facts are of an insubstantial nature, a mere scintilla, 'fanciful, frivolous, gauzy or merely suspicious,' summary judgment may be entered" under Sokolay v. Edlin, 65 N.J. Super. 112, 130 (App. Div. 1961). The court therefore entered judgment in favor of MedWell for $5,250.

As to MedWell's request for attorney's fees, the court found "under the agreement [MedWell] is only entitled to amounts incurred in pursuing amounts paid by insurance and not received by [MedWell]," while the balance sought here "represent[ed] mostly amounts relating to balances not covered by insurance at all." Further, it concluded "contingency fees are not fees 'incurred' in . . . pursuit of a debt collection" absent an explicit contractual provision for contingency fees. The court therefore denied MedWell's claim for attorneys' fees without prejudice.[4]

---

[4] Neither party challenges the denial of attorneys' fees, but we detail the court's ruling to provide background for appellants' later arguments.

E. Dismissal of Counts One through Four of the Bergen County Action

Subsequently, MedWell moved to dismiss counts one through four of the Bergen County action under Rule 4:6-2(e).  At oral argument, it contended the Passaic summary judgment order precluded re-litigation of the amount appellants owed under principles of collateral estoppel and further, MedWell was exempt from the CFA as a learned professional because it is "governed by the Board of Medical Examiners' practices."  Appellants responded the exception did not extend to "billing issues," and its claims were not precluded because part of the allegedly improper billing by MedWell involved attorneys' fees, which had been denied without prejudice in the Passaic County action.

In an August 31, 2020 written order and accompanying statement of reasons, the court granted MedWell's motion and dismissed counts one through four of the Bergen County action.[5]  It found each of the claims were "barred by collateral estoppel because [appellants] ha[d] already litigated these issues in [the] Passaic Special Civil Part, resulting in a decision for [MedWell]."  Relying upon First Union National Bank v. Penn Salem Marina, Inc., 190 N.J. 342, 352

---

[5] Although the heading of point II of appellants' merits brief states they request we reverse the dismissal of counts one through four of the Bergen County action, they specifically note within the body of point II that they do not seek review of the order as to counts three and four.  Accordingly, we limit our analysis to counts one and two.

(2007), the court explained collateral estoppel bars re-litigation of an issue when:

> (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.
>
> [Ibid.]

Here, the court determined "the first element is met because there is a 'high degree of similarity' between [appellants'] affirmative allegations in this case and the defenses and arguments raised by the [appellants] in the Passaic case." Specifically, it noted the "factual and legal arguments underlying [appellants'] CFA causes of action were outlined by [their] opposition to [MedWell's] summary judgment motion and in support of their cross motion."

The court also found the second and third elements of collateral estoppel satisfied "because, as outlined by the transcript of oral arguments in the Passaic [c]ase and the [c]ourt's [o]rders and [j]udgment, the issues were actually litigated and the [c]ourt issued a final judgment on the merits in [MedWell's] favor." It concluded the Special Civil Part had jurisdiction to enter the summary judgment order in the Passaic County action because appellants had consented

17

to jurisdiction by cross-moving for summary judgment and the Bergen County assignment judge had advised the Passaic County judge to resolve the outstanding motions prior to transfer. It also noted any jurisdictional challenge "should have been brought to the Appellate Division" rather than raised in the Bergen County action. Finally, the court concluded the last two elements of collateral estoppel were satisfied as the amount owed "was the central issue in the Passaic case as it is in this case" and all three parties were involved in both cases.

The court also found appellants' claims barred by the entire controversy doctrine. Relying upon Rule 4:30A, it noted "[n]on-joinder of claims required to be joined by the entire controversy doctrine shall result in the preclusion of the omitted claims to the extent required by the entire controversy doctrine" and reiterated the claims "bear a 'high degree of similarity' to those brought in the Passaic [c]ase."

Finally, the court concluded MedWell could not be held liable on counts one and two because of the learned professional exception to the CFA, which it explained, relying upon Lee v. First Union National Bank, 199 N.J. 251, 263 (2009), is a "judicially crafted rule, whereby 'certain transactions fall outside the CFA's purview because they involve services provided by learned professionals

in their professional capacity.'"  It noted learned professionals include "hospitals, attorneys, and nursing homes" and reasoned MedWell qualified for the exception "because it is overseen by the New Jersey Board of Medical Examiners, its operations are subject to specific regulatory framework, and . . . the [appellants'] claims arise out of [MedWell's] actions and operations relating to [its] professional capacities."  As noted, we do not detail the dismissal of counts three and four.  Appellants sought leave to appeal the dismissal order, which we denied.

## F. MedWell's Motion for Summary Judgment in the Bergen County Action

MedWell then moved for summary judgment with respect to the remaining counts of the complaint, which it supported with excerpts from the depositions of both appellants.  In the deposition of appellant Williams-Hopkins, MedWell's attorney inquired if she had suffered any damages as a result of the alleged improper disclosure.  She responded she would have to pay filing fees "in the future" and "had to pay her attorney because of legal fees" but did not know how much or whether she paid on an hourly or contingency basis.  She confirmed she had not "lost her job," been sued by anyone, "had to pay or will have to pay anyone else any money," or "lost any assets" as a result of the improper disclosure.  She characterized the loss she had suffered as related to "privacy"

but admitted she did not know if anyone had seen her medical information. Appellant Williams-Hopkins conceded she had never been to the website containing the "HIPPA [sic] Privacy Policy" referenced in the complaint, fixlowback.com, nor had she ever heard of it. She stated she did not know if appellant Hopkins had been to that website but he had never talked to her about it.

MedWell's attorney asked similar questions at appellant Hopkins's deposition. When asked what dollar amount of damages he incurred, appellant Hopkins responded "no dollar—I'd have to talk to my attorney on that one." He further noted he had to pay attorneys' fees, but denied suffering "any other damages," losing his job, being sued, being "treat[ed] differently," or otherwise being personally harmed in any way by virtue of the Passaic County action. He stated he was not sure if anyone had tried to use his personal medical information and admitted the information disclosed in the Passaic County action pertained solely to appellant Williams-Hopkins, with the exception of the insurance policy number they shared. Appellant Hopkins also confirmed he had not "reviewed MedWell's website prior to going to MedWell" nor had he ever been to fixlowback.com.

20

G. Denial of Class Certification in the Bergen County Action

Appellants moved to certify the classes identified in the complaint, providing in support the certifications of both appellants and their counsel. Appellants' counsel provided information pertaining to his qualification to be class counsel and explained he discovered "at least forty-two putative class members" who had their "private medical and health information" disclosed in collection actions brought by MedWell in New Jersey. Both appellants certified to their ability and willingness to act as class representatives as well as being "upset" upon discovering their "medical information was filed for anyone to view."

The court denied class certification pursuant to Rule 4:32-1 in a written order dated July 1, 2021. It explained appellants were required to "adequately define a class of plaintiffs" under Iliadis v. Wal-Mart Stores, Inc., 191 N.J. 88, 106 (2007), and demonstrate "(1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation" under In re Cadillac V8-6-4 Class Action, 93 N.J. 412, 424-25 (1983), and Rule 4:32-1(a). Additionally, the court noted appellants had to "satisfy one of the three criteria set forth in [Rule] 4:32-1(b)," specifically: (1) a risk of inconsistent judgments from separate prosecutions, (2) the opposing party's action or refusal to act "on grounds generally applicable

to the class as a whole," or (3) "common questions of law and fact" which "predominate over individualized questions."

The court found appellants failed to adequately define a class because "the other [forty-two] individuals that [appellants'] motion identifies as proposed class members have already been litigants in prior cases, and their cases have been disposed of—some years earlier—by way of judgment, default judgment, or settlement" and "[n]one of these proposed individuals raised any of these alleged issues prior to the disposition of those cases." Relying upon Watkins v. Resorts International Hotel & Casino, 124 N.J. 398, 412 (1991), it noted the doctrine of res judicata applies where "(1) the judgment in the prior action [was] valid, final, and on the merits; (2) the parties in the later action [are] identical to or in privity with those in the prior action; and (3) the claim in the later action [grew] out of the same transaction or occurrence as the claim in the earlier one." The court determined res judicata and the entire controversy doctrine barred the putative class members' claims because the prior collection actions in which MedWell allegedly improperly disclosed their medical information "have undeniably concluded," both MedWell and the proposed class members were parties to those actions, and "any claims against MedWell for such disclosure undoubtedly arose out of the same transaction or occurrence."

22

The court found appellants failed to establish numerosity, commonality, or typicality. It reasoned that, unlike appellants, there were no identified putative class members with "open and ongoing litigation" involving an improper disclosure, and further, appellants had provided no details as to the other proposed class members beyond "mere docket numbers."[6] Because the putative class members' claims were barred by res judicata and the entire controversy doctrine, the court concluded "there can be no questions of law or fact common to all of the class members." Additionally, it noted appellants had not "suffered any damages as a result of alleged disclosure of their health information by MedWell's attorney," while the complaint alleged the putative class members had "suffered compensable losses." Finally, because the only claim seeking declaratory or injunctive relief, count one, had been dismissed, the court found class certification pursuant to Rule 4:32-1(b)(2) was inappropriate.

H. Summary Judgment in the Bergen County Action

Subsequently, the court heard oral argument on MedWell's summary judgment motion. MedWell argued appellants had not established the elements

---

[6] The record before us does not include the document in which these docket numbers were identified.

of their remaining claims as they proved no actual damages, but even if they had, each of the claims were barred by the litigation privilege. With respect to the breach of contract claim, MedWell contended both appellants' depositions revealed they had never seen the website containing the "HIPPA [sic] Privacy Policy" allegedly breached and noted HIPAA provided no private right of action. As to the invasion of privacy claim, it asserted appellants had no reasonable expectation of privacy as the C&P and intake agreements "allowed MedWell to use their information." Finally, MedWell noted appellants could not "proceed in contract and tort at the same time based on the same underlying facts."

Appellants responded the parties' agreements could not "override" HIPAA, which was incorporated in MedWell's website and the agreements. Further, they argued MedWell had breached the standard of care established by HIPAA "which does not allow for the public disclosure of . . . protected health information."

The court granted MedWell's summary judgment motion and dismissed the remaining counts of the Bergen County action in an August 12, 2021 written order. First, it found counts five and seven were barred by the litigation privilege. Relying upon Hawkins v. Harris, 141 N.J. 207, 216 (1995), the court explained the privilege "applies to both invasion of privacy and negligence

A-0273-21

claims" and protects "any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action."  It concluded the disclosure of medical information in the Passaic County action was covered by the privilege because it was "(1) made in a judicial context[,] (2) by a party to the action, as it was contained in a court filing by MedWell, (3) made to achieve the objects of the litigation, and (4) has a clear logical connection to the action."  The court also found appellants had not shown "any actual damages as a result of the alleged disclosure of their health information," mandating dismissal of each of the three claims.

As to negligence, the court noted "a tort remedy does not arise from a contractual relationship unless the breaching party owes an independent duty imposed by law" under Saltiel v. GSI Consultants, Inc., 170 N.J. 297, 316 (2002).  Additionally, it found the parties' agreements "authorized disclosure of the [appellants'] health information for the purposes of payment collection."

With respect to count six, breach of contract, the court concluded appellants "could never have assented" to the "HIPPA [sic] Privacy Policy" referenced in the complaint as they denied having seen it prior to litigation. Even assuming the policy represented a contract between the parties, the court

A-0273-21

reasoned it was superseded by the C&P and intake agreements, which authorized the use of appellants' health information.

Finally, as to invasion of privacy, the court found appellants "had no reasonable expectation of privacy" with respect to the disclosed information. It noted their "failure to pay MedWell for services rendered essentially nullifies any reasonable expectation of privacy because certain information is essential and must be included when filing a lawsuit to collect the amounts owed." Further, the court reasoned "the terms of the agreement between MedWell and the [appellants] authorized MedWell to use the [appellants'] health information." The court also stated "[w]hile the invasion of privacy in and of itself can be a 'loss' to be compensated, those damages would merely be nominal." This appeal followed.

## II.

We next detail the various standards governing our review. "We review decisions granting summary judgment de novo," C.V. v. Waterford Twp. Bd. of Educ., 255 N.J. 289, 305 (2023), applying the same standard as the trial court, Townsend v. Pierre, 221 N.J. 36, 59 (2015). Like the motion judge, we "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational

26

factfinder to resolve the alleged disputed issue in favor of the non-moving party." C.V., 255 N.J. at 305 (quoting Samolyk v. Berthe, 251 N.J. 73, 78 (2022)). "Summary judgment is appropriate if 'there is no genuine issue as to any material fact' and the moving party is entitled to judgment 'as a matter of law.'" Ibid. (quoting R. 4:46-2(c)).

Similarly, we review an order granting a motion to dismiss under Rule 4:6-2(e) "de novo, applying the same standard under [that Rule] that governed the motion court." Wreden v. Twp. of Lafayette, 436 N.J. Super. 117, 124 (App. Div. 2014). That standard is whether the pleadings even "suggest[]" a basis for the requested relief. Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989). A reviewing court assesses only the "legal sufficiency" of the claim based on "the facts alleged on the face of the complaint." Green v. Morgan Props., 215 N.J. 431, 451 (2013) (quoting Printing Mart-Morristown, 116 N.J. at 746). The court must "search[] the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary." Printing-Mart Morristown, 116 N.J. at 746 (quoting Di Cristofaro v. Laurel Grove Memorial Park, 43 N.J. Super. 244, 252 (App. Div. 1957)). Consequently, "[a]t this preliminary stage of the litigation the [c]ourt is not

concerned with the ability of plaintiffs to prove the allegation contained in the complaint," ibid., rather the facts as pled are considered "true" and accorded "all legitimate inferences," Banco Popular N. Am. v. Gandi, 184 N.J. 161, 166 (2005).

Questions of law reviewed de novo include the application of preclusionary doctrines such as res judicata, Walker v. Choudhary, 425 N.J. Super. 135, 151 (App. Div. 2012), and collateral estoppel, Selective Ins. Co. v. McAllister, 327 N.J. Super. 168, 173 (App. Div. 2000). Under that standard, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

The application of the entire controversy doctrine "requires a mixed standard of review." Francavilla v. Absolute Resols. VI, LLC, ___ N.J. Super. ___, ___ (App. Div. 2024) (slip op. at 6). Specifically, "the law guiding the trial court's determination" is reviewed de novo, while "the decision to apply the doctrine, as an equitable principle," is subject to review for an abuse of discretion. Id. at ___ (slip op. at 6-7).

We also review an order denying class certification for abuse of discretion. Dugan v. TGI Fridays, Inc., 231 N.J. 24, 50 (2017). Specifically, we "must ascertain whether the trial court has followed [the standards set forth in Rule 4:32-1] and properly exercised its discretion in granting or denying class certification." Lee v. Carter-Reed Co., LLC, 203 N.J. 496, 506 (2010). A trial court abuses its discretion "when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Est. of Kotsovska by Kotsovska v. Liebman, 221 N.J. 568, 588 (2015) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)). "When examining a trial court's exercise of discretionary authority, we reverse only when the exercise of discretion was 'manifestly unjust' under the circumstances." Newark Morning Ledger Co. v. N.J. Sports & Exposition Auth., 423 N.J. Super. 140, 174 (App. Div. 2011) (quoting Union Cnty. Improvement Auth. v. Artaki, LLC, 392 N.J. Super. 141, 149 (App. Div. 2007)).

III.

A. The Parties' Arguments as to Summary Judgment in the Passaic County Action

We first address the summary judgment order in the Passaic County action. Before us, appellants reprise their argument that the court improperly construed the agreements to mean they owe an "outstanding balance on the

services after insurance payment." They contend this interpretation would render the other delineated obligations in the clause, such as the co-pay, co-insurance, and deductible, superfluous. Further, in an argument not raised below, appellants assert MedWell failed to present evidence as to whether the C&P or intake agreements controlled, or to reconcile the differences between the agreements. They maintain, viewing the evidence in the light most favorable to them, the court should have relied upon the intake agreements, which, unlike the C&P agreements, do not include the phrase "all other amounts to which my insurance company has not paid any sums" in outlining appellants' obligations. Appellants contend, under our de novo review, we should consider arguments concerning "trial court errors as a matter of law" even if not raised below.

Additionally, even assuming they are responsible under the agreements for more than the amount approved by their insurance, appellants argue MedWell may bill only a reasonable amount. They note the agreements listed no price for MedWell's services, and regulations, including N.J.A.C. 13:35-6.11, 13:39A-3.6, and 13:44E-2.11, permit doctors, physical therapists, and chiropractors to charge only non-excessive fees. They assert MedWell presented no evidence of the bill's reasonableness and the court should have

determined a reasonable amount was the $4,744 approved by their insurer, as shown in the EOBs.

In requesting we affirm, MedWell contends the appeal was untimely as the order was entered February 28, 2020 while appellants' notice of appeal was not filed until September 27, 2021, so it is barred by Rule 2:4-1(a). Additionally, it argues appellants' positions as to reasonableness and the alleged conflict between the agreements were not raised below and should not be considered.

As to the merits of the claims, MedWell asserts "[a]ppellants are judicially estopped from changing course to make arguments [that the agreements conflict] that contradict their earlier arguments to the lower court." It notes appellants acknowledged to the court the language in the C&P agreements controlled and simply disputed its interpretation. Further, MedWell asserts appellants' characterization of the agreements omitted certain language which causes both to arrive at the same result. With respect to reasonableness, it argues appellants' position is "frivolous" and not supported by the EOBs, which show a "balance due from the subscriber" or "patient liability." MedWell contends the EOBs are insufficient to prove the reasonable value of its services was simply the amount insurance approved.

B. Reasonableness was Raised Below and the Appeal was Timely

As a preliminary matter, we note the transcript of the summary judgment hearing in the Passaic County action demonstrates appellants did raise the issue of reasonableness before the court, contrary to MedWell's contention. We also reject MedWell's argument that the appeal was untimely because we are satisfied the February 28, 2020 order was not a final judgment. At the time that order was entered, the Passaic County action had already been consolidated with the Bergen County action, and appellants' claims against MedWell had not yet been resolved. Accordingly, appellants were not entitled to appeal as of right until the August 12, 2021 order resolved all outstanding claims as to all parties. See Silviera-Francisco v. Bd. of Educ. of Elizabeth, 224 N.J. 126, 136 (2016) (holding "an order is considered final if it disposes of all issues as to all parties") and Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J. Super. 162, 165 n. 2 (App. Div. 1998) (noting appeal from order resolving issues as to only one case underlying a consolidated matter was interlocutory). As appellants' notice of appeal was filed within forty-five days of that order, the appeal was timely. See Silviera-Francisco, 224 N.J. at 141 ("[a]n interlocutory order is preserved for appeal with the final judgment . . . if it is identified as a subject of the appeal").

A-0273-21

C. Appellants Established a Material Factual Issue Regarding Reasonableness

"Generally, plaintiffs have the burden of proving damages." Caldwell v. Haynes, 136 N.J. 422, 436 (1994). "Most often, courts award compensatory damages in a breach of contract action," which are intended to "put the innocent party into the position [it] would have achieved had the contract been completed." Totaro, Duffy, Cannova & Co., LLC v. Lane, Middleton & Co., LLC, 191 N.J. 1, 12-13 (2007). As our Supreme Court explained in Pacifico v. Pacifico, 190 N.J. 258, 266 (2007), "[w]hen the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." Ibid. (alteration in original) (quoting Restatement (Second) of Contracts § 204 (Am. L. Inst. 1981)).

In Hackensack Hospital v. Tiajoloff, 85 N.J. Super. 417 (App. Div. 1964), we considered a case with facts somewhat similar to those here. In that case, the plaintiff hospital sought to collect outstanding fees owed for treatment of defendant's child. Id. at 418-19. In support, plaintiff presented only its book account and the testimony of its comptroller. Id. at 419. On appeal, we vacated the judgment in favor of plaintiff and ordered a new trial, reasoning while "a hospital may prove the services which it rendered to a patient by its books of

account, . . . when the reasonable value of those services is placed in issue, as it was here, the books of account alone usually cannot supply that proof." Id. at 419-20. Specifically, from the book account alone, we noted "the trial judge was afforded no means of determining the value of the services" provided by plaintiff. Id. at 420-21.

We are convinced, based on our de novo review, the record demonstrates a material factual issue as to whether the amount billed by MedWell was reasonable. It is undisputed the agreements do not set forth a definite price for any service and nothing in the record suggests MedWell provided any sort of price list or estimate to appellants. Nevertheless, the agreements evidence "a bargain sufficiently defined to be a contract" which lacks "a term which is essential to a determination of [the parties'] rights and duties"—namely, the price for services—such that the court should supply a reasonable term. Pacifico, 190 N.J. at 266 (quoting Restatement (Second) of Contracts § 204).

MedWell presented no evidence to support the reasonableness of its bill aside from its book account and the certification of its account manager, like the hospital in Hackensack Hospital, 85 N.J. Super. at 419-20. As in that case, the proofs here "afforded [the court] no means of determining the value of the services" provided by MedWell. Id. at 420-21. Indeed, it is unclear how many

34

and which services were covered by the $8,900 charged, or whether they were provided by a physician, chiropractor, or physical therapist.

On the other hand, the EOBs relied upon by appellants raised a question as to reasonableness in the absence of any further evidence or finding by the court to the contrary. We recognize the EOBs show a remaining amount owed by appellants, but we note appellants' argument is that the amount approved by the insurer was approximately half of what MedWell charged, suggesting that amount was unreasonable. While we do not conclude the discrepancy between the amounts billed and those approved by the insurer is determinative proof of unreasonableness, as there may be many reasons why an insurance policy would cover only part of charges that were nonetheless reasonable, the EOBs, without more to contradict them, at the very least demonstrated a material factual question, precluding summary judgment.

D. There is No Inconsistency Between the Agreements as to Appellants' Financial Obligations to MedWell

In light of our determination, and the fact that appellants did not raise the issue of a potential conflict between the agreements before the court, we need not address that argument. Nevertheless, we are satisfied there is no factual question as to the consistency of the C&P and intake agreements with respect to

the nature of appellants' financial obligations to MedWell set forth therein. As noted, the C&P agreements provide:

> I am primarily responsible for, and agree to make payment of my [1] co-pay, [2] co-insurance, [3] applicable deductible amounts, and [4] all other amounts to which my insurance company has not paid any sums or as to any services by MedWell with respect to which my insurance company has denied coverage.

While the intake agreements differ, stating "I agree to pay the co-pay, co-insurance and applicable deductible amounts to MedWell immediately as and when each is billed or demanded by MedWell," they also provide:

> I further understand that certain services and care may not be covered by my insurance policy and therefore agree to pay for those services within 30 days of being billed by MedWell. I further agree to pay for the services I receive at MedWell within 30 days of being billed for such services in the event my insurance company denies coverage for any reason.

Taken as a whole, each set of agreements clearly indicates appellants were responsible for payment of not only their co-pay, co-insurance, and deductible, but any amounts not covered by insurance, subject to a determination those amounts were reasonable, as detailed above. We find no inconsistency that would have required MedWell to reconcile the two agreements.

36

IV.

A. The Parties' Arguments as to Dismissal in the Bergen County Action

We next turn to the order dismissing counts one through four of the Bergen County action. As noted, we limit our review to the CFA claims, counts one and two. Appellants argue the court erred in dismissing their claims because (1) preclusionary doctrines did not apply because the summary judgment order in the Passaic County action was not final, but interlocutory, and (2) the learned professional exception to the CFA did not apply to billing and collection practices because those functions are outside the protected realm of "services provided by learned professionals in their professional capacity." Appellants stress the Supreme Court "expressed its 'serious doubts that the billing and collection function at issue in [Manahawkin Convalescent v. O'Neill, 217 N.J. 99 (2014), regarding collection of nursing home fees] would qualify for the learned professional exception to the CFA.'" Id. at 124.

In response, MedWell first contends appellants do not make "any arguments relating to declaratory or injunctive relief" and thus, in reliance on that fact, it "does not address the [c]ourt's dismissal of [c]ount [one]." MedWell argues the court properly applied collateral estoppel as each of the elements were satisfied and "all of the [appellants]' factual and legal arguments

37

underlying their CFA claims in the [Bergen County action] were argued in their opposition to MedWell's summary judgment motion—and in support of their cross-motion for summary judgment—in the Passaic case." It also asserts the learned professional exception was properly applied here, as "courts have repeatedly held that billing and collection practices or rates are considered part of the services rendered and, as such, fall within the exception." In support, MedWell cites Manahawkin Convalescent v. O'Neill, 426 N.J. Super. 143, 155-56 (App. Div. 2012); Atlantic Ambulance Corp. v. Cullum, 451 N.J. Super. 247, 254 (App. Div. 2017); DiCarlo v. St. Mary's Hospital, 530 F.3d 255, 260 (3d Cir. 2008); and an unpublished case from the District of New Jersey. Further, it contends regulation under the CFA "could conflict" with the regulation of healthcare professionals' fees and billing practices by the New Jersey Board of Medical Examiners.

B. Appellants' Claims Were Not Barred by Any Preclusionary Doctrine

Res judicata is a "doctrine barring relitigation of claims or issues that have already been adjudicated." Walker, 425 N.J. Super. at 150 (quoting Velasquez v. Franz, 123 N.J. 498, 505 (1991)). Specifically, it requires "substantially similar or identical causes of action and issues, parties, and relief sought" as well as a "final judgment by a court or tribunal of competent jurisdiction." Id.

at 151 (quoting Charlie Brown of Chatham, Inc. v. Bd. of Adjustment for Chatham, 202 N.J. Super. 312, 327 (App. Div. 1985)). If applicable, res judicata precludes relitigation of "matters that were litigated" in the prior action as well as "all issues that could have been presented." Bondi v. Citigroup, Inc., 423 N.J. Super. 377, 428 (App. Div. 2011).

Within the broader umbrella of res judicata, collateral estoppel is a distinct branch, Allesandra v. Gross, 187 N.J. Super. 96, 103 (App. Div. 1982), which provides "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim," Winters v. N. Hudson Reg'l. Fire & Rescue, 212 N.J. 67, 85 (2012) (alteration in original) (quoting Restatement (Second) of Judgments § 27 (Am. L. Inst. 1982)). The doctrine facilitates society's interest in "finality and repose; prevention of needless litigation; avoidance of duplication; reduction of unnecessary burdens of time and expenses; elimination of conflicts, confusion and uncertainty; and basic fairness." Ibid. (quoting Olivieri v. Y.M.F. Carpet, Inc., 186 N.J. 511, 522 (2006)).

To determine whether collateral estoppel should preclude relitigation of an issue, our Supreme Court has set forth a five-factor test:

> [T]he party asserting the [doctrine] must show that: (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.
>
> [Ibid. (quoting Olivieri, 186 N.J. at 521)].

Each element must be satisfied for collateral estoppel to apply. Perez v. Rent-A-Center, Inc., 186 N.J. 188, 199 (2006). Even if all five factors are met, however, the court must not apply the doctrine if it would be unfair to do so. Ibid.; see also Allen v. V & A Bros., Inc., 208 N.J. 114, 138 (2011).

The entire controversy doctrine is another similar, but distinct, part of the broader res judicata umbrella which "generally requires parties to an action to raise all transactionally related claims in that same action." Largoza v. FKM Real Est. Holdings, Inc., 474 N.J. Super. 61, 79 (App. Div. 2022) (quoting Carrington Mortg. Servs., LLC v. Moore, 464 N.J. Super. 59, 67 (App. Div. 2020)). It "encompasses not only matters actually litigated but also other aspects of a controversy that might have been litigated and thereby decided in an earlier

action." Francavilla, ___ N.J. Super. at ___ (slip op. at 8) (quoting Higgins v. Thurber, 413 N.J. Super. 1, 12 (App. Div. 2010)).  The doctrine is codified at Rule 4:30A, which provides in relevant part:  "non-joinder of claims required to be joined by the entire controversy doctrine shall result in the preclusion of the omitted claims to the extent required by the entire controversy doctrine, except as otherwise provided" in foreclosure and summary actions.  Although not defined in the Rule, our Supreme Court has explained the claims "required to be joined" are those which "'arise from related facts or the same transaction or series of transactions' but need not share common legal theories."  Bank Leumi USA v. Kloss, 243 N.J. 218, 226 (2020) (quoting Dimitrakopoulos v. Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, P.C., 237 N.J. 91, 119 (2019)).

The entire controversy doctrine serves "three fundamental purposes:  '(1) the need for complete and final disposition through the avoidance of piecemeal decisions; (2) fairness to parties to the action and those with a material interest in the action; and (3) efficiency and the avoidance of waste and the reduction of delay.'"  Id. at 227 (quoting DiTrolio v. Antiles, 142 N.J. 253, 267 (1995)).  "[B]ecause the entire controversy doctrine is an equitable principle, its applicability is left to judicial discretion based on the particular circumstances inherent in a given case."  Francavilla, ___ N.J. Super. at ___ (slip op. at 8)

41

(alteration in original) (quoting Mystic Isle Dev. Corp. v. Perskie & Nehmad, 142 N.J. 310, 323 (1995)).  It should not be applied "if such a remedy would be unfair in the totality of the circumstances and would not promote the doctrine's objectives of conclusive determinations, party fairness, and judicial economy and efficiency."  Bank Leumi, 243 N.J. at 227-28 (quoting Dimitrakopoulos, 220 N.J. at 119).

We first note, contrary to MedWell's contention, appellants clearly indicated they challenged the court's order as to both CFA counts, and the court's dismissal was not predicated upon the relief sought.  As detailed above in section III, the summary judgment order in the Passaic County action was not a final judgment because, as the cases were consolidated, it did not resolve all issues as to all parties.  See Silviera-Francisco, 224 N.J. at 136 and Prudential, 307 N.J. Super. at 165 n. 2.  Nothing in the consolidation order shows the court stayed consolidation or otherwise conditioned it upon resolution of the Passaic County action.  Indeed, it would make little sense to consolidate the two cases after one was fully resolved.  See R. 4:38-1(a) (providing court may order consolidation of "actions involving a common question of law or fact arising out of the same transaction or series of transactions [which] are pending in the Superior Court"

(emphasis added)). Accordingly, the elements of collateral estoppel have not been satisfied and the doctrine does not apply under these circumstances.

Addressing the entire controversy doctrine, it is undisputed the Passaic County action and the Bergen County action arise from the same set of facts— namely, MedWell's treatment of appellants, appellants' alleged failure to pay the amount billed for that treatment, and MedWell's attempts to collect the outstanding balance. We are convinced, however, that application of the entire controversy doctrine here was inappropriate. While appellants initiated the Bergen County action separately from the collection action, the two matters had been consolidated by the time MedWell moved to dismiss. Thus, "all transactionally related claims" were being litigated in a single action. Largoza, 474 N.J. Super. at 79.

Additionally, application of the entire controversy doctrine in these circumstances would not serve its "fundamental purposes" as set forth in Bank Leumi, 243 N.J. at 227. By moving for consolidation prior to resolution of any substantive issues in either case, appellants sought to avoid "piecemeal decisions" or inconclusive determinations. Ibid. Appellants informed MedWell as early as their answer in the Passaic County action that they would be filing a class action complaint and seeking to consolidate the cases. Any unfairness to

43

MedWell was arguably caused by its choice to move for summary judgment in the Passaic County action prior to resolution of the then-pending consolidation motion. While we acknowledge the consolidation resulted in some delay, we are not convinced that delay was unreasonable, nor that appellants' actions led to any waste or judicial inefficiency. In the totality of the circumstances, we are satisfied it would be unfair to preclude appellants from litigating their claims when their actions did not run afoul of the entire controversy doctrine's aims.

C. The Record was Insufficient to Apply the Learned Professional Exception to the CFA at the Motion to Dismiss Stage

Next, we discuss the CFA and its learned professional exception. We note "[g]enerally, Rule 4:6-2(e) dismissals should not be granted based on an affirmative defense because such defenses typically 'must be pleaded.'" Mac Prop. Grp. LLC v. Selective Fire & Cas. Ins. Co., 473 N.J. Super. 1, 38 (App. Div. 2022) (quoting Prickett v. Allard, 126 N.J. Super. 438, 440 (App. Div. 1974)). Where an affirmative defense's applicability "appears on the face of the complaint," however, "dismissal under Rule 4:6-2(e) may be proper." Ibid. (quoting Prickett, 126 N.J. at 440).

"The CFA was enacted to 'provide[ ] relief to consumers from "fraudulent practices in the market place."'" Dugan, 231 N.J. at 50 (alteration in original) (quoting Lee, 203 N.J. at 521). The act is "applied broadly in order to

accomplish its remedial purpose, namely, to root out consumer fraud." Manahawkin, 217 N.J. at 121 (quoting Gonzalez v. Wilshire Credit Corp., 207 N.J. 557, 576 (2011)).

"N.J.S.A. 56:8-2 prohibits, as an unlawful practice, the 'act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, [or] misrepresentation . . . in connection with the sale or advertisement of any merchandise[7] or real estate, or with the subsequent performance of such person as aforesaid.'" Lee, 199 N.J. at 257 (first two alterations in original) (quoting N.J.S.A. 56:8-2). To prevail on a CFA claim, the plaintiff must establish (1) "unlawful conduct by defendant"; (2) "an ascertainable loss by plaintiff"; and (3) "a causal relationship between the unlawful conduct and the ascertainable loss." Dugan, 231 N.J. at 52 (quoting D'Agostino v. Maldonado, 216 N.J. 168, 184 (2013)).

The learned professional exception is a judicially-created rule whereby "certain transactions fall outside the CFA's purview because they involve services provided by learned professionals in their professional capacity." Lee, 199 N.J. at 263. Our Supreme Court formally recognized the exception in Macedo v. Dello Russo, 178 N.J. 340 (2004), in which it explained:

---

[7] The CFA's definition of "merchandise" includes services. N.J.S.A. 56:8-1(c).

Certainly no one would argue that a member of any of the learned professions is subject to the provisions of the [CFA] despite the fact that he [or she] renders "services" to the public. And although the literal language may be construed to include professional services, it would be ludicrous to construe the legislation with that broad a sweep in view of the fact that the nature of the services does not fall into the category of consumerism.

[Id. at 344 (quoting Neveroski v. Blair, 141 N.J. Super. 365, 379 (App. Div. 1976))].

The Court further noted advertising by professionals was not permitted at the time the CFA was enacted, so the CFA could not have been understood to encompass it. Id. at 343. It also reasoned the Legislature had never amended the CFA to include professionals, despite earlier case law suggesting such an exception existed. Id. at 346. Accordingly, the Court concluded "learned professionals [are] beyond the reach of the [CFA] so long as they are operating in their professional capacities." Id. at 345-46.

The types of professionals protected by the exception include doctors, id. at 346, and attorneys, Vort v. Hollander, 257 N.J. Super. 56, 62 (App. Div. 1992). In Shaw v. Shand, 460 N.J. Super. 592 (App. Div. 2019), we concluded "'semi-professionals' who are regulated by a separate regulatory scheme," such as home inspectors, were not covered by the exception. Id. at 599. We explained the exception "must be narrowly construed to exempt CFA liability only as to

46

those professionals who have historically been recognized as 'learned' based on the requirement of extensive learning or erudition." Ibid. To the extent prior decisions relied upon regulation of semi-professionals to hold otherwise, as in Plemmons v. Blue Chip Insurance Services, Inc., 387 N.J. Super. 551, 564 (App. Div. 2006) and Atlantic Ambulance, 451 N.J. Super. at 257-58, we found such rationale "inconsistent with the Supreme Court's decision in Lemelledo v. Beneficial Management Corp. of America, 150 N.J. 255 (1997)." Shaw, 460 N.J. Super. at 599, 616. Rather, we held "the existence of a separate regulatory scheme will 'overcome the presumption that the CFA applies to a covered activity' only when 'a direct and unavoidable conflict exists between application of the CFA and application of the other regulatory scheme or schemes.'" Id. at 616 (quoting Lemelledo, 150 N.J. at 270). In other words, semi-professionals are not encompassed in the learned professional exemption simply because they are subject to regulation.

Various functions have been found to be within a learned professional's professional capacity and thus exempt from CFA liability, including advertisements, billing, and fees. See Macedo, 178 N.J. at 346 (representations in advertising within doctor's professional capacity) and Vort, 257 N.J. Super. at 62-63 (fee arrangements and billing within attorney's professional capacity).

47

Conversely, professionals may be held liable under the CFA for services provided outside their professional capacity. See, e.g., Macedo, 178 N.J. at 346 (doctor "engag[ing] in the merchandising of a golf course, a vacation time-share or a medical office building" subject to CFA) and Finderne Mgmt. Co. v. Barrett, 402 N.J. Super. 546, 568 (App. Div. 2008) (accountant working as financial planner subject to CFA).

Here, based on the liberal standard under which we review a motion to dismiss, we are convinced the record was insufficient to permit the court to conclude the learned professional exception applied at this early stage without further information. As previously noted, MedWell employs not only doctors, but also chiropractors and physical therapists, and nothing in the record reveals which of these services were encompassed in appellants' bill, or to what extent the doctor, chiropractor, or physical therapist was involved in billing. We are not persuaded by the authority cited by MedWell, as none of these cases considered a situation where the nature of the services or professional at issue was unclear, as here.

Without a better understanding as to which services appellants received or from which type of provider, we cannot determine, based on the record before the court on MedWell's Rule 4:6-2 motion, whether the billing for those services

48

was within the professional capacity of a learned professional and thus exempt from CFA liability. Nothing in our decision should be construed as reflecting our opinion on the outcome of the proceedings on remand, particularly upon further proofs regarding the services provided and the involvement of any learned professional in billing for those services.

V.

A. Appellants' Arguments as to Class Certification in the Bergen County Action

We next examine the court's order denying class certification. Appellants argue the court erred in denying certification because it "failed to explain any reason the closure of MedWell's collection case[s] [against the putative class members] matters with regard to the [d]isclosure [c]laims." They contend the elements of their claims did not require the collection actions to be pending, and the disclosure of the putative class members' private medical information "is not conduct arising out of the same transaction as the claim for unpaid services," and therefore did not need to be brought as counterclaims. Relying upon LoBiondo v. Schwartz, 199 N.J. 62, 105 (2009), appellants analogize their claims to those for "malicious use of process and malicious abuse of process," torts for which no cause of action arises until the initial underlying case is

concluded. Additionally, they note the court made no findings with respect to their satisfaction of <u>Rule</u> 4:32-1(b)(3). We are not convinced.

<u>B. Appellants Failed to Establish Numerosity and Typicality of the Class</u>

"A 'class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."'" <u>Dugan</u>, 231 N.J. at 46 (quoting <u>Iliadis</u>, 191 N.J. at 103). A class action "furthers numerous practical purposes, including judicial economy, cost-effectiveness, convenience, consistent treatment of class members, protection of defendants from inconsistent obligations, and allocation of litigation costs among numerous similarly-situated litigants." <u>Ibid.</u> (quoting <u>Iliadis</u>, 191 N.J. at 104). To achieve these objectives, "our courts have 'consistently held that the class action rule should be liberally construed.'" <u>Ibid.</u> (quoting <u>Lee</u>, 203 N.J. at 518).

The standard for whether a class should be certified is set forth in <u>Rule</u> 4:32-1. Four initial requirements, "frequently termed 'numerosity, commonality, typicality, and adequacy of representation,'" are set forth in subsection (a) of that <u>Rule</u>. <u>Dugan</u>, 231 N.J. at 47 (quoting <u>Lee</u>, 203 N.J. at 519). <u>Rule</u> 4:32-1(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact

50

common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

The court then must consider the additional requirements set forth in subsection (b) of the Rule. Appellants here sought certification pursuant to subsections (b)(2), which requires a showing "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole," and (b)(3), which requires the court find "[1] the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and [2] that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." R. 4:32-1(b). In the event the court denies class certification, the named plaintiffs may continue to pursue their individual claims. See Myska v. N.J. Mfrs. Ins. Co., 440 N.J. Super. 458, 465 (App. Div. 2015) (noting named plaintiffs' individual breach of contract claims proceeded despite affirming denial of class certification).

We are satisfied the court did not abuse its discretion in concluding appellants had not satisfied the numerosity or typicality requirements to certify

the putative class. Contrary to appellants' contention, the court clearly indicated the undisputed closure of the putative class members' underlying collection actions was relevant to class certification because it indicated those actions could preclude the class members from litigating the issues raised in appellants' claims under the entire controversy doctrine or res judicata. Based on the record before the court, the class members did not raise these issues in the underlying collection cases, even though they could have, and thus they would be precluded from doing so in this class action. In contrast, appellants consolidated the Passaic County action into the Bergen County action and thereby avoided improper fragmentation of the litigation.

As it is undisputed all of the underlying collection actions against the class members were closed and thus would almost certainly preclude their participation in the Bergen County action, appellants have failed to meet the numerosity requirement to certify the class. Additionally, appellants' circumstances as the representative parties are not "typical of the claims or defenses of the class," due to the differing procedural posture of their individual claims against MedWell. R. 4:32-1(a). Because we are satisfied the court did not abuse its discretion in determining appellants failed to satisfy subsection (a) of the Rule, we need not reach subsection (b).

52

C. Appellants' Disclosure Claims Did Not Require Resolution of the Underlying Collection Actions

We are not persuaded by appellants' attempts to analogize their claims to the torts of malicious use and abuse of process. We note such claims are "treated with great caution." LoBiondo, 199 N.J. at 89. Nothing about any of the claims asserted here require the resolution of the underlying case, unlike malicious use and abuse of process, see id. at 90 (malicious use of process claim requires the underlying action be "terminated favorably to the plaintiff"). Indeed, appellants brought their claims prior to the termination of the Passaic County action; the putative class members could have but failed to do the same.

VI.

A. The Parties' Arguments as to Summary Judgment in the Bergen County Action

Finally, we address the order granting MedWell summary judgment and dismissing counts five through seven of the Bergen County action. Appellants contend the court erred in dismissing each count because the disclosures were not relevant to any object of the litigation, rendering the litigation privilege inapplicable. Additionally, they maintain they had a reasonable expectation of privacy in the information disclosed because HIPAA and state regulations impose a duty to protect such information, they never waived the physician-

patient privilege, and failure to pay a bill does not constitute a waiver of their privacy rights.

In response, MedWell reprises its arguments that (1) appellants failed to establish damages, (2) the litigation privilege applies because the insurance information disclosed was relevant and necessary to establish the amount it was owed, and (3) appellants had no reasonable expectation of privacy in the disclosed information because the agreements permitted MedWell to use their information. Further, it notes appellants did not challenge the court's determination with respect to damages, and HIPAA and the physician-patient privilege have no applicability to appellants' claims.

B. Appellants Failed to Demonstrate a Material Factual Issue as to Damages for Their Negligence and Breach of Contract Claims

Addressing counts five and six, the negligence and breach of contract claims, we conclude the court did not err in dismissing either. "The fundamental elements of a negligence claim are [1] a duty of care owed by the defendant to the plaintiff, [2] a breach of that duty by the defendant, [3] injury to the plaintiff proximately caused by the breach, and [4] damages." Coleman v. Martinez, 247 N.J. 319, 337 (2021) (quoting Robinson v. Vivirito, 217 N.J. 199, 208 (2014)). Plaintiff has the obligation to prove each element. Ibid.

To establish a breach of contract claim, the plaintiff must prove (1) "the parties entered into a contract containing certain terms," (2) "plaintiff did what the contract required [them] to do," (3) "defendant did not do what the contract required [them] to do," and (4) "defendant's breach . . . caused a loss to the plaintiff." Woytas v. Greenwood Tree Experts, Inc., 237 N.J. 501, 512 (2019) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016)). The defendant is "liable for all of the natural and probable consequences of the breach." Totaro, Duffy, Cannova & Co, 191 N.J. at 13 (quoting Pickett v. Lloyd's, 131 N.J. 457, 474 (1993)). Again, the plaintiff has the burden to prove each element. Globe Motor, 225 N.J. at 482.

Specifically, with respect to damages in both types of claims, the plaintiff must "prove damages with such certainty as the nature of the case may permit, laying a foundation which will enable the trier of the facts to make a fair and reasonable estimate." Totaro, Duffy, Cannova & Co, 191 N.J. at 14 (quoting Lane v. Oil Delivery, Inc., 216 N.J. Super. 413, 420 (App. Div. 1987)). Generally, attorneys' fees may not be recovered as damages "when the fees were incurred in an action to establish th[e] defendant's liability." In re Est. of Lash, 169 N.J. 20, 30 (2001). "No matter how egregious th[e] wrongful act, in the direct action between a plaintiff and a defendant, each party bears his or her own

fees under the American Rule." DiMisa v. Acquaviva, 198 N.J. 547, 554 (2009). Similarly, court costs are not typically considered damages. Magnet Res., Inc. v. Summit MRI, Inc., 318 N.J. Super. 275, 292-93 (App. Div. 1998); see also Restatement (Second) of Torts, § 914 (Am. L. Inst. 1979) ("[t]he damages in a tort action do not ordinarily include compensation for attorney fees or other expenses of the litigation").

"[N]ominal damages . . . do not attempt to compensate the plaintiff for an actual loss" but are rather "a trivial amount" to "'serve[] the purpose of vindicating the character' of 'a plaintiff who has not proved a compensable loss.'" Graphnet, Inc. v. Retarus, Inc., 250 N.J. 24, 38 (2022) (ellipses and second alteration in original) (first quoting Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 48 (1984) and then quoting Nuwave Inv. Corp. v. Hyman Beck & Co., Inc., 221 N.J. 495, 499 (2015)). Where "proof of actual damage is an essential part of the plaintiff's case," as in negligence and breach of contract claims, nominal damages cannot be recovered "where no actual loss has occurred." Rosenau v. New Brunswick, 51 N.J. 130, 138 (1968).

Here, the summary judgment record reflects no material factual question with respect to damages for counts five and six. Neither appellant presented any evidence, in their deposition or otherwise, of any damages that would satisfy

their burden. As noted, the attorneys' fees and filing fees appellants identified do not constitute recoverable damages. We are satisfied the competent evidential materials presented, even in the light most favorable to appellants, are insufficient to permit a rational factfinder to conclude appellants established damages, a necessary element of their claims for negligence and breach of contract.

C. Appellants Established a Material Factual Issue as to Invasion of Privacy

We next examine count seven, invasion of privacy. "Invasion of privacy 'is not one tort, but a complex of four,'" including (1) "intrusion on plaintiff's physical solitude or seclusion," (2) "public disclosure of private facts," (3) "placing plaintiff in a false light in the public eye," and (4) "appropriation, for the defendant's benefit, of the plaintiff's name or likeness." Smith v. Datla, 451 N.J. Super. 82, 95 (App. Div. 2017) (first quoting William L. Prosser, The Law of Torts § 112 (3d ed. 1964) and then quoting Rumbauskas v. Cantor, 138 N.J. 173, 180 (1994)).

Here, appellants allege public disclosure of private facts, which requires them to prove "[1] the matters revealed were actually private, [2] dissemination of such facts would be offensive to a reasonable person, and [3] there is no legitimate interest of the public in being apprised of the facts publicized." Id. at

96 (quoting <u>Romaine v. Kallinger</u>, 109 N.J. 282, 297 (1988)). Additionally, the information must be revealed "to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge," as "it is not an invasion of the right of privacy . . . to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons." <u>Castro v. NYT Television</u>, 384 N.J. Super. 601, 611 (App. Div. 2006) (quoting <u>Restatement (Second) of Torts</u>, § 652D cmt. a).

1. Appellants' Reasonable Expectation of Privacy in Their Personal Medical Information was Not Eroded by The Agreements or Alleged Failure to Pay

Published facts that are "actually private" are those which are not "in the public domain" nor "a matter of legitimate public concern." <u>Romaine</u>, 109 N.J. at 299-301. In other words, the plaintiff "must establish that [they] possessed a reasonable expectation of privacy" in the information disclosed. <u>G.D. v. Kenny</u>, 205 N.J. 275, 309 (2011). "Patients have a privacy right in their medical records and medical information." <u>Smith</u>, 451 N.J. Super. at 99 (citing <u>United States v. Westinghouse Elec. Corp.</u>, 638 F.2d 570, 577 (3d Cir. 1980)). Additionally, <u>Rule</u> 1:38-7(a) characterizes insurance policy numbers as "confidential personal identifier[s]" which are prohibited from inclusion in court documents unless otherwise required by "statute, rule, or court order," indicating a reasonable expectation of privacy in that information as well.

We are not convinced that appellants' right to privacy in their personal medical information was vitiated by either the agreements or their alleged failure to pay MedWell. The C&P agreements authorized MedWell to disclose appellants' "personal, health, or treatment information or files to [their] insurance company." Here, MedWell disclosed the information not to appellants' insurer, but to anyone who viewed the publicly available court records. The C&P agreements further permitted MedWell to use appellants' "statements . . . relating to the services and care [they] receive" only "for purposes of advertising, publicity, and trade." The disclosures here were indisputably not for any of those authorized purposes.

The intake agreements fare no better. Those authorized release of appellants' "personal, protected health information and treatment related information or files to [their] insurance company or third-party payor." Again, the disclosures here were not made to appellants' insurer or a third-party payor. The intake agreements also allowed MedWell to use appellants' "information, including but not limited to healthcare information, . . . relating to the services and care [they] receive" but again, only "for purposes of advertising, publicity and trade." The disclosures made in the Passaic County action were not authorized by the plain language of either set of agreements.

59

Additionally, we are not persuaded appellants' failure to pay necessitated the repeated inclusion of this personal medical information in the Passaic County action, contrary to the court's conclusion. MedWell makes no attempt to explain how appellant Williams-Hopkins' medications, surgical history, family medical conditions, and allergies were necessary or even relevant to MedWell's claim that she breached the agreements by allegedly failing to pay the amount charged. While appellants' joint insurance policy number was potentially relevant to show, for example, that they were insured under the same policy, we are satisfied appellants established a material factual question as to whether inclusion of the complete policy number was necessary. Indeed, MedWell could have redacted all but the last four digits of the number, or simply indicated the name of appellants' insurer. Further, most of what MedWell sought to collect from appellants were fees for which it claimed appellants were personally liable, beyond what their insurance approved.

2. A Material Factual Question Exists as to Whether MedWell's Disclosures Were Protected by the Litigation Privilege

We must also discuss the litigation privilege, which the court relied upon to grant MedWell summary judgment. The litigation privilege protects "any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the

60

litigation; and (4) that have some connection or logical relation to the action." Buchanan v. Leonard, 428 N.J. Super. 277, 286 (App. Div. 2012) (quoting Loigman v. Twp. Comm. of Middletown, 185 N.J. 566, 585 (2006)). As our Supreme Court explained, "lawyers and litigants must 'be permitted to speak and write freely without the restraint of fear of an ensuing defamation action.'" Loigman, 185 N.J. at 580 (quoting Fenning v. S.G. Holding Corp., 47 N.J. Super. 110, 117 (App. Div. 1957)). The privilege applies not only to defamation claims, however, but to "a host of other tort-related claims." Id. at 583.

We are convinced the summary judgment record before the court demonstrates a material factual question as to whether the litigation privilege protects the disclosures here. Although it is undisputed the disclosures were made in a judicial proceeding, the Passaic County action, by a litigant, MedWell, it is less clear whether the information was disclosed "to achieve the objects of the litigation." Buchanan, 428 N.J. Super. at 286 (quoting Loigman, 185 N.J. at 585). As noted, the personal medical information disclosed lacks any "connection or logical relation to the action," except the insurance policy number, the inclusion of which was arguably unnecessary to show the amounts owed to MedWell or that appellants improperly retained checks issued by their insurer. Ibid. (quoting Loigman, 185 N.J. at 585).

### 3. Appellants Were Not Required to Prove Monetary Damages for Their Invasion of Privacy Claim

Unlike negligence and breach of contract, "[d]amages may be recovered for invasion of privacy, even if the injury suffered is mental anguish alone." Faber v. Condecor, Inc., 195 N.J. Super. 81, 90 (App. Div. 1984). In Faber, the plaintiffs testified defendant's unauthorized use of a photograph of them made them feel "distressed," "embarrassed," and "very upset." Id. at 85. We concluded their "testimony concerning their displeasure with the picture's appearance in defendant's frames and the mental distress they suffered" was sufficient to award damages. Id. at 90.

Unlike their claims for negligence and breach of contract, damages are not an element of appellants' public disclosure of private facts claim and thus it required no showing of actual damages. See Smith, 451 N.J. Super. at 96 and Rosenau, 51 N.J. at 138. Instead, nominal damages may be awarded. Rosenau, 51 N.J. at 138. Additionally, appellants' certification that the disclosure of their personal medical information resulted in their feeling "upset" is similar to the testimony of the plaintiffs in Faber, 195 N.J. Super. at 85, which was sufficient for an award of damages in that case.

## VII.

To summarize, we reverse the grant of summary judgment to MedWell in the Passaic County action. We reverse the dismissal of the CFA claims, counts one and two of the Bergen County action. We affirm the denial of class certification. We affirm the grant of summary judgment to MedWell as to the negligence and breach of contract claims, counts five and six of the Bergen County action. We reverse the grant of summary judgment to MedWell as to the invasion of privacy claim, count seven of the Bergen County action. Accordingly, on remand the court should consider (1) MedWell's breach of contract claim, (2) appellants' individual CFA claims for damages and declaratory and injunctive relief, and (3) appellants' individual invasion of privacy claims.

Affirmed in part, reversed in part, and remanded.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0273-21